### THE "NEVADA."

1. An ocean steamer starting from a crowded slip, the motion of her propeller caused a canal-boat to break her fastenings and swing around against the propeller, whereby she was sunk. The steamer had no lookout at her stern, by whom the peril of the canal-boat might have been seen in time to stop the propeller and prevent the collision. *Held*, that the steamer was in fault.
2. Towage should be employed, when necessary to enable a large steamer to leave a crowded slip or harbor without damaging other vessels.
3. Steamers and locomotives should be so managed and operated as to do the least possible injury consistent with their substantial usefulness.
4. Those in charge of the canal-boat, in this case, having done all that reasonable prudence required of them, by properly fastening their boat, were held free from blame.

APPEAL from the Circuit Court of the United States for the Southern District of New York.

The case is stated in the opinion of the court.

*Mr. Stephen P. Nash* for the appellant.

*Mr. Eugene H. Lewis* and *Mr. Robert D. Benedict* for the appellee.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This case arises upon a libel filed in the District Court for the Southern District of New York by S. J. Quick, master and owner of the canal-boat "Kate Green," for himself and for F. A. McKnight, against the steamship "Nevada," in a cause of collision. The libel alleges that McKnight was invested by subrogation, or otherwise, with the interest of the Western Insurance Company of Buffalo, who were insurers of 8,100 bushels of corn, the cargo of the "Kate Green" at the time of the collision; that on the 27th of September, 1871, whilst the

boat was lying securely fastened in a slip in New York City, between piers No. 46 and No. 47 on the North River, the "Nevada," which had been moored in the same slip on the north side of pier No. 46, proceeded on her way to sea, and carelessly and negligently ran into and struck the "Kate Green" with her propeller, causing her to sink, whereby she was greatly injured and her cargo destroyed, resulting in a total damage of $12,000.

The Liverpool and Great Western Steam Company appeared as claimants of the "Nevada," and answered the libel, setting up that the collision was occasioned solely by the carelessness and negligence of the master and crew of the "Kate Green."

McKnight filed a petition for leave to intervene, setting forth his interest in the cargo, to wit, that it had been insured by the Western Insurance Company, which became liable for and paid the full value thereof to the owners, and afterwards became bankrupt, and at the sale of its assets, he, McKnight, became the purchaser of its claims arising from the loss and destruction of said cargo. He was allowed to intervene accordingly.

Proofs being taken, a decree was made by the District Court that the libellants recover their damages and costs against the "Nevada," and it was referred to a commissioner to ascertain the amount of damage.

The commissioner reported that the damage done to the "Kate Green," her furniture, loss of freight, and interest, amounted to $4,289.72; and that the damage to the cargo, with interest, was $8,109.64. A decree was made for these sums, with costs.

Upon appeal to the Circuit Court this decree was affirmed, and a new decree was entered (including interest to the date of the decree) in favor of Quick for the sum of $4,577.65, besides costs; and in favor of McKnight for the sum of $8,653.98, besides his costs.

The owners of the "Nevada" have appealed from this decree. So far as relates to Quick, the owner of the "Kate Green," under the recent ruling of this court in *Ex parte Baltimore & Ohio Railroad Co.*, ante, p. 5, the appeal must be dismissed; as to McKnight, it is necessary to examine the case at large.

The Circuit Court found the facts in detail, of which it is sufficient to state, that about 3 o'clock P. M., Sept. 27, 1871, the propeller steamship "Nevada," belonging to one of the regular lines between New York and Liverpool, was lying alongside of pier No. 46 in the slip between that pier and pier No. 47 on the North River, New York, about to start on her voyage to Liverpool. She had been advertised to start at that hour, had rung her bells and blown her whistle several times, and her signals for starting were flying at mast-head. At that instant, before her screw was put in motion, a steam-tug entered the slip with the canal-boat "Kate Green" in tow, and placed her alongside of another canal-boat, the "C. H. Hart," lying fastened to a grain elevator, which was in turn fastened to the steamship "Scotia," lying alongside pier No. 47, on the north side of the slip. The master and steersman of the "Kate Green," which lay about sixty feet from the "Nevada," instantly made her fast to the "C. H. Hart," and at that moment the propeller of the "Nevada" began to revolve, and produced a suction and commotion of the water which caused the "C. H. Hart" to break her fastenings, and the "Kate Green" to swing around under the stern of the "Nevada," where she was struck by the propeller and sunk, and much injured, and her cargo was lost. She was not seen from the "Nevada" when she came in, and no special notice was given to her that the "Nevada" was about to leave, and those in charge of her had no actual knowledge of the fact until the propeller of the "Nevada" began to move. As soon as she began to swing around her master called loudly to the "Nevada" to stop her propeller, but he was not heard, or, if heard, not heeded.

The court further found as follows: —

"10. No one on board of the 'Nevada' knew of the parting of the 'Hart's' lines, or of the swinging of the 'Green,' or of the accident, until after they arrived in Liverpool. If a man had looked from her deck over her side into the slip, he could not have failed to see what was going on all the time, from the first movement of the propeller, and before, until she got out.

"11. There was an abundance of time after the breaking of the fastenings of the 'Hart,' and after the 'Green' began to

swing, and after the hail of her master, to have stopped the propeller, before the collision.

"12. The report of the commissioner as to the damages is warranted by the evidence, and the libellant, McKnight, was the owner of the claim for damages when the libel was filed."

The conclusions of law found by the Circuit Court were as follows : —

"1. The 'Nevada' was in fault for not keeping a sufficient lookout aft and on the side next the slip, and in not seeing the 'Kate Green' when she came in, or as she swung over, and in not stopping the propeller in time to avoid the collision.

"2. The 'Kate Green,' under the peculiar circumstances in which she was placed, was not in fault.

"3. The libellants are entitled to recover the damages reported by the commissioner."

It seems hardly necessary to do more than to state the case as the facts are found by the court in order to decide it. The "Kate Green" came into the slip, it is true, at the time the "Nevada" was about to leave ; and those in charge of her ought to have known this fact from the ringing of the "Nevada's" bells and her visible signals for starting. But supposing they did know it, what more could they do than they did do? They immediately made fast to the "C. H. Hart," which was also made fast to the ship lying at the North Pier. It was reasonable for them to suppose that the fastening of the "C. H. Hart" was secure. They could not know that it would break. It was that break which set them adrift, subject to the suction caused by the motion of the "Nevada's" propeller. Their own fastenings were sufficient. We do not see how the court could find otherwise than that they were free from fault or negligence. Perhaps they might have done something else which would have been better. The event is always a great teacher. They might have stayed out in the river and not entered the slip ; or, having entered, they might have gone back to the bulkhead, and stayed there till the "Nevada" left. But these possibilities are not the criteria by which they are to be judged. The question is, Did they do all that reasonable prudence required them to do under the circumstances? And this question, we think, must be answered in the affirmative.

Then, how is it with the "Nevada?"   Did those on board of her do all that was reasonably required of them?   It is significantly asked by her counsel, whether a steamship is to be precluded from the use of her own means of locomotion?   Must she be subjected to the inconvenience and expense of employing a tug to tow her out into open water?   That does not necessarily follow.   If, indeed, the action of her propellers is such as to cause unavoidable injury to other craft in a crowded harbor, or in a confined space like that of a slip or dock used by vessels of every kind, she might be justly required to find other means of moving in a position involving so much peril.   This is no more than is required in analogous cases. Railroad companies are compelled to slacken the speed of their trains in passing through cities, and are often either prohibited from using ordinary locomotive engines in the more public streets, or required to guard their tracks by means of gates, bars, or fences, in order to prevent accidents and collisions. Incidental inconveniences, it is true, attach to the use of many of the great improvements of the age; inconveniences which must be submitted to in order that the public may have the benefit of those improvements.   Almost every new machine inflicts loss of employment upon some portion of the laboring class, which are thus obliged to seek other fields of industry. Steamboats have taken the place of sailing-vessels; railroads have interfered with steamboats, and have rendered useless thousands of stage-coaches, and the appliances connected with them.   The vast power and speed of the modern locomotive engine, carrying its thousand passengers, or its hundreds of tons of merchandise, require the private carriage and the country team to await its passage and give it the right of way. The large steamer which navigates our rivers creates an agitation of the waters which cannot be prevented without staying its speed and crippling its usefulness, and which requires from smaller vessels in its neighborhood increased attention and care to avoid being foundered or injured.   Horse railroads in cities incumber the streets with their iron tracks, and render the passage of private vehicles more difficult and dangerous.   But whilst these incidental and unavoidable inconveniences must be submitted to in order that the greater benefit derived from

the new improvements may be enjoyed, there still remains the duty of so managing and operating them as to do the least possible injury consistent with the fair attainment of their substantial benefits. The ocean steamer is one of the great inventions of the century, and one of the advanced instrumentalities of modern civilization ; but whilst it may freely exercise its powerful propeller and sport its leviathan proportions on the ocean or in deep and open waters, it is justly required to observe extraordinary care and watchfulness when surrounded by feebler craft in a crowded harbor. Under some circumstances, and within a limited space, it may even be required to dispense with the use of its ordinary means of locomotion, and resort to the employment of towage or other safe and quiet means of changing its position and effecting its necessary movements. Such a modification of the use of its power, when absolutely required for the safety of other vessels rightfully located in its vicinity, would produce no material diminution of its efficiency in the accomplishment of its principal design.

However, we do not mean to say that, in the application of these principles to the present case, it was the duty of the "Nevada" to remit the use of her propeller in leaving her place in the slip where she lay. The court does not find her in fault for using it, but for not having a lookout at her stern, and on the side next to the slip, who could have seen the breaking away of the "Hart" and the "Kate Green" from their fastenings, and, by giving timely alarm, could have averted the disaster by a momentary stopping of the "Nevada's" engine. In such a place, and in the midst of such a crowd of vessels as then filled the slip, since she did put her propeller in motion, she was bound to use the utmost caution and circumspection in order to avoid doing injury. The least that could be expected of her was a constant lookout at every part. But the court finds that "no one on board of the 'Nevada' knew of the parting of the 'Hart's' lines, or of the swinging of the 'Green,' or of the accident, until after they arrived at Liverpool. If a man had looked from her deck over her side into the slip, he could not have failed to see what was going on all the time, from the first movement of the propeller, and before, until she got out." And the court further finds that "there

was abundant time after the breaking of the fastenings of the 'Hart,' and after the 'Green' began to swing, and after the hail of her master, to have stopped the propeller before the collision."

This, as it seems to us, settles the case, and amply justifies the conclusion of law made by the court below, that "the 'Nevada' was in fault for not keeping a sufficient lookout aft and on the side next the slip, and in not seeing the 'Kate Green' when she came in, or as she swung over, and in not stopping the propeller in time to avoid the collision." In view of the principles to which we have adverted, and which ought to control this case, no other conclusion could have been reached.

We see no error in the decree of the Circuit Court, and it is therefore, with interest and costs,

*Affirmed.*