## THE NORTHLAND.

(District Court, W. D. New York.   September 15, 1903.)

No. 105.

1. COLLISION—VESSEL LANDING AT DOCK—DUTY TO KEEP LOOKOUT.

   It is the imperative duty of a steamship, when making a landing at a dock in a river where other vessels are constantly passing, to maintain an efficient lookout, and the absence of such lookout cannot be excused on the ground that all the crew were otherwise engaged.

2. SAME.

   A large lake steamship was making her berth in Buffalo river where it was about 250 feet wide.   A steam canal boat, with two other boats in tow on a line, passing down the river, meeting a tug when about opposite, after giving the proper signals, went to starboard, and passed within a few feet of the steamship, which was apparently stationary at her berth.   The steamship had no lookout, and no watch astern, and paid no attention to the passing vessels or their signals.   When one of the tows was opposite the stern of the steamship, the latter started one of her propellers at high speed, creating a suction which drew the canal boat from her course and caused a collision, resulting in the sinking of the canal boat soon after, from injury inflicted by the ship's propeller. Had a proper watch been maintained, and attention given to the passing tows, the injury might readily have been avoided.   *Held*, that the ship was in fault, and that the canal boat was not in fault or negligent, having the right to assume that the ship would perform her duty, and avoid subjecting the passing boats to danger of collision by operating her propellers.

In Admiralty.   Suit for loss of cargo through collision.

George Clinton, for libelant.

Joseph G. Dudley and Harvey L. Brown, for the Northland.

John W. Ingram and Frederick G. Mitchell, for Lena Beadle.

HAZEL, District Judge.   This is a proceeding in rem against the steamship Northland, and in personam against the owners of the canal boats Campania and Columbia, to recover certain damages to the Campania's cargo, resulting from the negligent manner in which the aforesaid vessels were navigated, whereby the Campania was sunk. Upon the abandonment of the cargo by the cargo owners, libelant paid to them their loss, and thereby became subrogated to their legal rights and remedies.

The facts established by the proofs are these:   On June 18, 1900, at about 5 o'clock in the afternoon, weather clear, the large passenger steamship Northland, returning from a trial trip on Lake Erie to the port of Buffalo, N. Y., proceeded unaided under her own motive power up Buffalo river to the dock at the foot of Main street, her regular landing.   As the steamship was getting into her berth, the steam canal boat Columbia, in charge of a licensed pilot, having the canal boats Campania and Chicora in tow, each heavily laden, one astern of the other in the order named, came north towards the river through Peck Slip, which enters Buffalo river from the south just above the point where the bow of the Northland ordinarily lies when secured to her dock.   The canal boats were each approximately 98 feet in length over all, and 18 feet beam.   The Northland has two engines port and

starboard, with corresponding screws, and is 386 feet over all, 40 feet beam, and of 5,000 tons burden. The Columbia's tow line from her stern to the Campania was about 20 feet long and the towline from the stern of the Campania to the Chicora about 35 feet. At the time the steamer was making her berth, with her stern near mid-stream, the Columbia and tow were then entering Peck Slip from Blackwell Canal, and gave the usual bend signal of one blast of her whistle. She repeated the signal very soon afterwards, upon leaving the slip to turn into the river. The Northland, having stopped her headway, was then alongside the opposite northerly bank, her bow resting approximately 30 feet distant from the Columbia, which had straightened into the river, and had sounded several short and rapid blasts of her whistle to an approaching steam tug on her port side. These signals were sounded in compliance with governing rules, usage, and custom. None of the signals were answered by the steamship, and no attention was paid by her to the Columbia and tow. Believing the Northland to be stationary in her berth, the Columbia proceeded in her course in a westerly direction down the north side of the river, and about 20 feet distant from the steamship on her starboard side. The Northland's port propeller was in motion to facilitate landing. It freely lashed the water, causing a suction which suddenly drew the Columbia's bow, without any warning, towards the propeller, but by a prompt maneuver she straightened into her course. The motion of the screw then stopped, but very soon afterwards, just as the stern of the Campania came opposite the steamer's fan tail, the Northland's starboard propeller, suddenly and without warning, began to rapidly revolve, producing a suction and commotion of the water which drew the passing Campania towards the revolving screw under the stern of the Northland, where the screw impinged upon her starboard quarter. The Campania, by reason of this injury, soon afterwards sunk in Watson Slip, which is near by, whither she was assisted by the steam tug Cascade. Her cargo was greatly damaged. At the point of collision the channel is approximately 250 feet wide, and steam tugs, vessels, canal boats, and tows are constantly passing. The Columbia and tow were not seen by the master of the Northland, and her signals were not heard, or, if heard, were not heeded. No lookout was stationed upon the steamer's deck, instructed to report signals or the approach in the river of other vessels. Neither had the Northland a lookout at her stern or on her starboard side, next to the river, who could have seen a passing vessel or tow, or a threatened danger, and, by giving timely warning, have stopped the engine until the tow had safely passed beyond the steamer's stern. The master of the Northland substantially testifies upon this point that, if he had known of the presence of the tow, he could have averted the injury to the Campania by stopping the revolving propeller within half a minute. According to the engineers of the Northland, all of whom were on duty at their post, the engines were stopped instantly upon hearing and feeling the jar of the collision, and before receiving the signal to stop from Capt. Brown. In explanation of the absence of a lookout, the master of the Northland further testifies that it is not usual or customary for landing steamers to have a lookout forward and

astern when the vessel is practically secure in her berth, or, indeed, while she is proceeding up the river to her dock. The claim of the steamship is that her propellers were alternately and continually working for quite a distance before reaching her place of landing. To get into her berth, she worked her bow slowly towards the dock, using her port propeller to go ahead, and at the time of the accident her starboard propeller was used to throw her stern, which was 15 feet out in the stream, towards the dock. There was a barge ahead, alongside the dock, and an excursion steamer immediately astern of the steamship's berth, requiring the landing to be made between them. While the Northland was in this situation, with her bow line around the timber head on the dock, and the heaving line at stern, ready to make fast, and almost ready to discharge her passengers, her master, who was upon the bridge on the port side, quite a distance from the accident, felt a slight jar, and almost instantly received a signal from aft to stop the steamship's propeller. This was done. The injury to the Campania, however, had then happened.

The argument of counsel for the Northland, explaining the absence of a lookout, is based upon the fallacious theory that the entire attention of the officers and entire crew was needed to make a safe and careful landing; that to report passing vessels to the master at such time would distract his attention, so that safe landing might be imperiled. This contention cannot be held to be in accord with that degree of care and vigilance which a steamer is bound to exercise in seeking her berth or in making a landing. It is unimportant whether a steamship is endeavoring to effect a landing or a departure. The duty to maintain a proper lookout is imperative, and where vessels are in close proximity the absence of such a lookout is not sufficiently excused by other engagements of the crew. Thorp v. Hammond, 79 U. S. 408, 20 L. Ed. 419. The degree of care required of a steamship depends upon the circumstances surrounding each particular case. The measure of care demanded by the particular situation may be extraordinary care and watchfulness or such reasonable care only as a prudent person would use to avoid doing injury. The Nevada, 106 U. S. 159, 1 Sup. Ct. 234, 27 L. Ed. 149; The City of New York, 54 Fed. 181, 4 C. C. A. 268. I am of opinion that the Northland is at fault for not having had a competent lookout, properly instructed to report to the master signals and approaching vessels, and also for lack of proper watch astern. Had such precautionary measures been taken, the accident could easily have been averted. Indeed, had the plain obligation to avoid harm to other vessels having equal rights in the river been heeded, the prospect of the injury complained of would have been exceedingly remote. Such injury could then have been received only through the negligence of the injured ship. It is a positive legal duty of a vessel, in making her berth or dock, to stop moving if in motion in a channel or narrow river, where other vessels are passing, whenever injury is threatened to another vessel on account of the commotion produced in the water by her screw. The Nevada, supra; The City of Macon (D. C.) 20 Fed. 159; The Colon, Fed. Cas. No. 3,025; Clapp v. Young, Fed. Cas. No. 2,786. No custom or usage can be established requiring a less reasonable precaution. The

City of New York, supra, cited by counsel for respondent, is not a precedent here. That case merely holds that no recovery could be had by a tug employed to assist the respondent vessel to her dock, because such tug had notice of the intermittent use of the libeled steamship's propellers, and therefore voluntarily assumed a position of danger. In the case at bar the Columbia three times gave notice by signaling of her presence and movements. Assuming that the Northland's propeller, while docking, was astir in the water, which the Columbia should have seen, she nevertheless had a right to presume that the revolutions of the propellers would momentarily cease, or at least would be operated with due regard to her proximity and safety. Irrespective of conflicting testimony as to whether the Northland was actually stationary in her berth, the Columbia was undoubtedly justified in believing that the steamship was so secured to her dock that no harm or danger to her, as a passing tow, need be apprehended. The failure of the Northland to answer the signals sounded by the Columbia when she turned into the river, and on account of her nearness to her place of landing, might well convince the Columbia that she could proceed safely in her course down the river alongside and in close proximity to the Northland.

The respondent steamship contends that the propellers of the Northland were intermittently in continual motion in the steamship's entire course up the river to her berth; that the commotion of the water produced by the propeller could have been observed for a distance of more than 100 feet, and therefore the approaching Columbia must be held in fault for directing her course through the water in close proximity to the screw. This contention lacks merit, for, as already remarked, the Columbia was entirely justified in assuming that the Northland would perform her duty in such a situation, and seasonably stop the propeller to prevent injury. Nor was the Columbia negligent in continuing in her course after she had succeeded in safely passing the steamship. I am satisfied from the evidence that the port propeller, which was in motion, stopped while the Columbia was passing. Under the circumstances, she could very properly assume that her passing with tow had been noted by the officers of the Northland, and no further danger or harm would be precipitated by the movement of any of her propellers. The evidence clearly preponderates that the sudden and unexpected starting of the starboard propeller as the Campania was passing, in and of itself, produced the accident, which, however, as we have seen, could have been avoided by the presence of a competent lookout. The absence of a lookout at such a time, stationed where danger to passing vessels in the river could be observed, and timely notice given to the officers in charge, is a fault for which the Northland is liable. In failing to comply with this reasonable precaution, the burden is upon the Northland to prove that the accident was owing to other causes, for which she is not chargeable. Clapp v. Young, supra; The Hansa, Fed. Cas. No. 6,037. The cases hold that "where fault on the part of one vessel is established by uncontradicted testimony, and such fault is of itself sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some pre-

sumption, at least, adverse to its claim with regard to the propriety of the conduct of such other vessel, and any reasonable doubt should be resolved in its favor." Such is the doctrine enunciated in The City of New York, 147 U. S. 85, 13 Sup. Ct. 211, 37 L. Ed. 84. See, also, The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Oregon, 158 U. S. 187, 15 Sup. Ct. 804, 39 L. Ed. 943.

I conclude, on the evidence as a whole, that the charges of fault set forth in the cross-libel are not well founded. The evidence abundantly shows that a wide turn of the bend of the river by the towing canal tug was made necessary to safely navigate the tow on account of the presence of a dredge and scow which were moored on the opposite bank, and which occupied approximately 50 feet of the river. It also appears that the steam tug Elk was passing up the river on the port side of the Columbia and tow. These conditions made it practically necessary that the Columbia and tow should pass down in a course close to the north bank of the river, and hence in close proximity to the Northland. The evidence of the respondent owners of the Columbia and of the Campania sustains the view that both canal boats were properly navigated and equipped. On all the evidence, therefore, no fault for the collision is attributable to them, or either of them. The cross-libel is dismissed.

A decree may be entered for libelant against the steamship Northland, and an order of reference to the clerk of this court to compute the damages.