### NEW YORK & ORIENTAL S. S. CO. v. NEW YORK, N. H. & H. R. CO.

(District Court, S. D. New York. January 4, 1906.)

1. COLLISION—TUG AND TOW AND STATIONARY VESSEL—DEFENSE OF INEVITABLE ACCIDENT.

Where a collision occurred between a car float on the side of a tug and a steamship, which was being docked and was at the time stationary, the defense of inevitable accident is not made out by the tug by evidence that she and her tow were forced against the steamship by a large body of floating ice, which was not seen until within 50 feet, and when too late to avoid it, where it appears that there was no lookout on the tug, and the pilot's view was obstructed by the cars on the float, that the attention of the lookout stationed on the float was directed entirely to the piers, and that a lookout properly stationed and attentive to his duties would have seen the ice in time to have avoided it.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, §§ 95, 101, 141.]

2. SAME—INSUFFICIENT LOOKOUT.

Where the attention of a lookout on a vessel is necessarily absorbed in a special direction, it is the duty of the vessel to detail another man for the general duty.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, §§ 141–144.]

In Admiralty. Suit for collision.

Butler, Notman & Mynderse, for libellant.

William Greenough and Joseph H. Choate, Jr., for respondent.

ADAMS, District Judge. This action was brought by the New York & Oriental Steamship Company, the owner of the steamer Shimosa, to recover from the New York, New Haven & Hartford Railroad Company, the damages sustained through an injury to the said steamer caused by a collision with Car Float No. 26, in tow on the port side of Transfer No. 5, both owned and operated by the respondent, on the 6th day of January, 1904, about 3 o'clock p. m. The Shimosa was engaged in the Oriental trade, and having taken on board a part of her cargo at pier 33, East River, was towed by three tugs to pier 36, East River, to complete her loading. While the steamer was engaged in docking upon the north side of said pier, under the control of the tugs, having no steam in her boilers, the collision took place, the port side of the float being brought in violent

contact with the stern and rudder of the steamer. No fault is charged against the latter, and the sole question to be determined is whether the respondent's claim that the accident was inevitable should be sustained, or whether the respondent should be held liable for negligence, in any of the following respects charged against it, viz.:

\* \* \* \* \* \* \*

"3. In not avoiding the steamer Shimosa and in taking no steps whatever calculated to avoid said steamer by reversing her engines, or by putting said engines at full speed in forward motion under a port wheel.

"4. In not keeping a vigilant lookout.

\* \* \* \* \* \* \*

"6. In not taking steps before backing out from pier 51 to ascertain whether her intended berth on the upper side of pier 48 was free."

On the general features of the case, there is not very much conflict in the testimony. The tide was ebb, of about the strength of two miles and at the place in question ran true along the ends of the piers. The wind was about E. S. E. but not of great force.

It appears that the Shimosa put out a line to the end of pier 36 and was by the efforts of the tugs in charge of her pushed around the north side of the pier and slowly, by reason of the presence of ice there, worked in, so that at the time of the collision, her stern was only a few feet, if at all, outside the end, although she had not yet succeeded in getting alongside of the pier.

The No. 5 took Float No. 26 in tow at pier 50, so that the sterns of the vessels were about even, for the purpose of delivering her at the lower side of pier 49, the second pier below. The float was about 210 feet long and the tug 95 feet. The float was loaded with 12 cars. Pier 36, where the Shimosa was lying, was the second pier below 49. The tug backed out until the float was about 100 feet clear of pier 50. She backed and filled, drifting down with the tide, and somewhat angling towards the piers, until the end of pier 48 was reached, the next pier to 36, when the float's stern being about half way between 48 and 36, and her bow 75 to 100 feet out, she waited under one bell, until a small tug, called a pogey boat, should move a tow from the upper side of pier 48.

I had occasion to consider the situation somewhat in an action against the respondent company and the tug Robert Burnett. The latter was towing some vessels astern down the river. The float No. 26 there came in contact with one of these vessels and both the tug and the respondent were held in fault for want of lookouts on the vessels. The Robert Burnett (C. C.) 134 Fed. 700. This collision happened a few minutes later. After the Burnett collision, the No. 5 and float approached nearer to the piers so that they were practically helpless, if the ice was such a factor as contended for, and without fault if due precautions were observed by those on No. 5.

It seems to me doubtful if such a quantity of ice as claimed was encountered. It was said that the floe was twice the size of the float and that it was set free from a collection on the Brooklyn side of the river by a large unknown steamer passing down and not seen by those on the tug or float until within 50 or 60 feet of the latter, then too late for No. 5 to take adequate measures to prevent trouble from it.

Assuming that the contention with respect to the ice is true, nevertheless the tug has not brought herself within the provisions which would entitle her to escape liability by the plea of an inevitable accident.

That is defined by the Supreme Court in The Mabey and Cooper, 14 Wall. 204, 215, 20 L. Ed. 881, as follows:

"Where the collision occurs exclusively from natural causes, and without any negligence or fault on the part of either party, the rule is that the loss must rest where it fell, as no one is responsible for an accident which was produced by causes over which human agency could exercise no control. Such a doctrine, however, can have no application to a case where negligence or fault is shown to have been committed on either side. Inevitable accident, as applied to a case of this description, must be understood to mean a collision which occurs when both parties have endeavored, by every means in their power, with due care and caution, and a proper display of nautical skill, to prevent the occurrence of the accident, and where the proofs show that it occurred in spite of everything that nautical skill, care, and precaution could do to keep the vessels from coming together.

\*       \*       \*       \*       \*       \*       \*

"Palpable error is shown to have been set up in the original answer filed by the owners of the ship, and the court is not satisfied that the defence set up in the amended answer is entitled to any more credit. Such a defence as that set up, that a ferryboat suddenly and improperly crossed the bows of the steam tug, if founded in fact, could easily be proved by those who were on board the ferryboat and know what occurred. Instead of that, not even a name of the ferryboat is given, either in the answer or in the proofs, and not a witness is called except the pilot and the master of the ship, and their statements in that behalf are not satisfactory. No such defence is set up in behalf of the steam tug, and nothing of the kind was alleged in the original answer filed by the owners of the ship shortly after the suit was commenced. Neither of the courts below appear to have given that defence much credence, and this court concurs with the subordinate courts that the defence is not established."

The language there used applies with considerable force to this case. In the action in which The Robert Burnett was a party, no such plea was put forward as is attempted to be established here. There it was simply denied that the collision took place, which was overruled because the proofs established the fact and it appeared that the tug and float had no adequate lookout. Such seems to be the fact here, so that even if the ice in such quantities as claimed were there and had the effect contended for, still there was no proper lookout upon the implicated vessels. A plea of inevitable accident should be supported by more evidence of proper care on the part of a moving vessel, colliding with a stationary one, than a claim that a large moving field of ice, which must have been in view for several minutes, was not seen until within a space of about 50 feet, when it was too late to take any measures to avoid its effect.

The pilot on the tug was practically useless as a lookout. His view of objects on the surface of the water was obstructed by the cars on the float. If there was a lookout stationed on the cars as contended, he was obviously not attending to his duty to keep the river in view, so that the approach of this danger could be seen in ample time to cause measures of precaution to be taken. If his whole attention was absorbed by the necessity of keeping a close watch upon the piers, then another man should have been detailed to the general duty. Kennedy v. Steamer Sarmatian (C. C) 2 Fed. 911; Greenwood v.

The William Fletcher and The Grapeshot (D. C.) 38 Fed. 156; The Nevada, 106 U. S. 154, 159, 1 Sup. Ct. 234, 27 L. Ed. 149.

Decree for the libellant, with an order of reference.