PITTSBURGH & ERIE COAL CO. v. GEORGE URBAN MILLING CO.

SAME v. BUFFALO GRAIN CO.

(District Court, W. D. New York. May 24, 1915.)

1. SHIPPING ⬤⟿200—GENERAL AVERAGE—RIGHT OF SHIP TO CARGO CONTRIBUTION—EVIDENCE.

The stranding of a grain steamer inside the breakwater as she was turning to enter the Buffalo river *held*, on the evidence, not due to the negligence or incompetence of her master, but to the action of the cross-currents, the force of which could not always be accurately estimated, and the vessel *held* entitled to a general average contribution from the cargo to the expense of lightering a part of the same.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 631–634; Dec. Dig. ⬤⟿200.]

2. SHIPPING ⬤⟿189—GENERAL AVERAGE—SUIT TO RECOVER CARGO CONTRIBUTION.

That the protest on which the claim of a stranded vessel to a general average contribution from the cargo to the expense of lighterage is based did not state all of the particulars of the stranding does not lessen the force of the master's sworn testimony.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 601, 603; Dec. Dig. ⬤⟿189.]

3. SHIPPING ⬤⟿189—GENERAL AVERAGE—LIABILITY OF CARGO.

The recovery of a general average contribution rests on equitable grounds, and a vessel is barred from such recovery only for her fault, and not for an error of judgment on the part of her navigator.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 601, 603; Dec. Dig. ⬤⟿189.]

In Admiralty. Suits by the Pittsburgh & Erie Coal Company, owner of the steamship P. D. Armour, against the George Urban Milling

Company, and against the Buffalo Grain Company. Decrees for libelant.

Holding, Masten, Duncan & Leckie, of Cleveland, Ohio, for libelant.
Brown, Ely & Richards, of Buffalo, N. Y., for respondents.

HAZEL, District Judge. [1] On November 12, 1909, the steamship P. D. Armour, 300 feet in length, with 42-foot beam, stranded on a known shoal located just north of the channel entrance to Buffalo river. The steamer had on board a full cargo of grain, 97,000 bushels, which she had brought down the Great Lakes from Duluth to the port of Buffalo, and as her seams opened a little after she stranded, owing to the lowering of the water in the harbor, it seemed necessary, in the judgment of the master, when a tugboat had been unsuccessful in releasing her, to lighter a portion of her cargo of grain. The question now is whether the steamer was stranded through negligent navigation, which would relieve the consignees of the cargo from contribution and general average, or through accident or perils of the sea, in which case the expense of releasing the vessel must be borne proportionately by the ship and cargo in accordance with the general average bond (Exhibit A) in evidence.

The proofs show that on nearing the Buffalo breakwater the master of the P. D. Armour entered at the south entrance or gap, which enabled him to proceed on a northerly course behind the breakwater to the point of turning into the navigable channel leading into Buffalo river. While he was still out on Lake Erie, the course and velocity of the wind indicated to him a normal depth of water at the entrance to Buffalo river; but after coming through the south gap of the breakwater he observed from markings on the break wall that it was not improbable that the water had lowered a few inches. When about 500 feet from the north end of the break wall, he ported the steamer's wheel and began turning in the ordinary way, but while swinging the steamer slowed, and, believing that she smelled the bottom aft, he immediately gave directions to hard aport and rang up the engine, with a view to accelerating her swinging movement, but she did not turn quickly enough, and he then put her wheel midships and backed, to stop her headway and kick her stern to port, so as to swing her into the channel, but she nevertheless grounded. It is shown that there is a cross-current at the point where the turning occurred, varying in velocity from 2 to 4 miles, and that there is no way of ascertaining the strength of the current with reasonable accuracy. In the opinion of the master of the steamship, the maneuvering described was necessary at the turning point to overcome the drift of the current and to clear the channel bank; but notwithstanding such efforts the steamship grounded on the port side, although there was ample depth of water at the stern and on the starboard side. Efforts were made to release her with tugs, but without success. The wind veered around to the northward, and then to the northeast, and, the depth of water continuing low, the ship began to leak from the strain. Because of her imperiled position, on November 13th and 14th some of her cargo was lightered, and she was released. From these facts I think there

was a common peril to the ship and cargo, as that term is interpreted in Willcox, Peck & Hughes v. American Smelting Co. (D. C.) 210 Fed. 89, and that the expense of lightering was a proper subject for general average.

The respondent contends that the master was negligent, in that he failed to exercise ordinary skill and precaution in the management of the vessel; that he knew that the water was low, and that normally there was only 19 feet of water in the channel, while the draft of the steamer was 17 ft. 6 in. forward and about 18 ft. 6 in. aft, and must therefore be presumed to have been aware that there was a probability that the vessel would touch bottom and steer badly; that he was bound to know of the current and its variability and force; that the steamer was a "bad-steering" boat; and that he did not reverse soon enough under the conditions presented. But in my opinion the asserted claims of negligence and want of ordinary skill and precaution are not sufficiently established. The law requires that the master of a vessel must at all times take such precautions as a man of ordinary prudence and skill, exercising reasonable foresight, would use to avoid ordinary dangers in view of the circumstances presented. The William Lindsay, 2 Asp. M. L. C. 118, 119. The question in such cases is, What would prudent and skillful navigators do under similar circumstances? and what constitutes negligence is dependent upon what they are capable of doing.

It is claimed that the master of the Armour should have called on tugs to assist him, but the situation did not seem so precarious to him as to require that something out of the ordinary be done. The evidence is that vessels of the type of the steamer in question do not ordinarily employ tugs to assist them into the channel entrance, and I do not think the condition of the wind and current was such as to indicate the necessity of the employment of a tug to assist the steamer in making her berth. Of course, in the light of what actually occurred, it would have been better if a tugboat had been engaged to assist in maneuvering the steamer into the channel; but, as said in The Nevada, 106 U. S. 154, 1 Sup. Ct. 234, 27 L. Ed. 149, the possibility of doing something different from what was done is not the criterion by which the event is to be judged.

Before the cargo owners can be relieved from liability for contribution on their general average bond, it must be proven that the stranding and resulting damage to the cargo were due to fault on the part of the carrying ship, and such fault is not satisfactorily disclosed herein. It is true a witness who was standing on the Lackawanna trestle, not far distant from where the stranding occurred, swore that the vessel did not swing until about halfway past the north end of the breakwater; but, even supposing her swing to have been belated, it can scarcely be disputed that by backing she could have recovered sufficiently to make the channel safely, if the current had not interfered to prevent her doing so. If credence is given to the testimony of the master and first mate, and there is insufficient showing to disparage or contradict it, they both believed that the turning movement was proper and seasonable, and the steamer went ahead in the channel pur-

suant to direction of her master, without his suspecting the severity of the current which prevented her from clearing the channel bank, and which carried her to the east entrance of the Reading Channel, where she grounded. As said by Judge Brown in The State of Alabama (D. C.) 17 Fed. 854:

"Navigation must necessarily be according to observation at the time. The observations made in this case, both in the mistake and in the correction of it, were, so far as I can judge, as quick, active, and accurate as the circumstances at the moment admitted. The error was one of judgment in the interpretation of what dimly met the eye, and not, under the circumstances, evidence of either carelessness or incompetency."

So, in the present case, the master of the steamer was acquainted with the width of the channel, knew of the shoal, and, indeed, was somewhat familiar with the variable currents at this point; but nevertheless his error in not turning earlier or in not turning quickly enough, or the slight touching of the vessel on bottom, were not due to negligence.

[2] Importance is attached to the master's omission to state, in the protest on which the claim for contribution by the cargo to the expense of lighterage is made, that the swinging of the vessel was retarded by her touching the bottom; but his failure to state all the particulars leading to the mishap would not justify ignoring or discrediting the sworn testimony in relation thereto, which is corroborated by the first mate, who was on deck forward, and who attributed the disaster to the fact that the current was against the vessel, and that "she did not steer very good sometimes in shallow water, the same as all of them."

[3] The case of Kinsman Transit Co. v. The Mason and Cascade, 221 Fed. 799, recently decided in this court and cited by respondent, was upon a different principle from the case at bar. The question of general average contribution rests upon equitable grounds, and renders the vessel liable only for her fault, and not for an error of judgment on the part of her navigator, as a result of which an accident occurs, to the injury of her cargo. The Star of Hope, 9 Wall. 230, 19 L. Ed. 638.

The rule as to burden of proof is that the vessel seeking to exonerate herself must show that the sacrifice of the cargo was not occasioned by her negligence, and, having done so, the burden is then shifted to the party asserting negligence or carelessness. Congdon, General Average, p. 67. Such burden has not been sustained by respondents, and the libelant's explanation that the expense of lightering the cargo was made necessary through accident is not sufficiently negatived or refuted.

Decree for libelant, with costs.