## THE MARY J. KENNEDY.

### THE TRANSFER NO. 14.

(District Court E. D. New York. May 13, 1924.)

Collision ⊚⇒99—Two tugs colliding, injuring one and throwing it. against and injuring scow, held both at fault, one in floating downstream bow towards shore without lookout at stern, and the other in being on wrong side and not continuing to look.

Two tugs, one the K., floating with the tide down the East River, with bow towards and near the Manhattan side, looking for berth, the other the T., going upstream, *held* both at fault in collision of T. with K., injuring it and throwing it against scow moored at pier, the T. in being on wrong side of stream and not continuing to watch the K. after seeing it, thinking it was going into a slip, and the K. in not having a lookout at the stern, the proper place under the circumstances, so that both are liable for injury to the scow, and damages to the K. should be divided.

In Admiralty. Two libels, one by James Gregway, owner of the boat Saranac, against the steam tug Mary J. Kennedy, the Kennedy Towing Line, Incorporated, claimant, which impleaded the steam tug Transfer No. 14, the New York, New Haven & Hartford Railroad Company, claimant; the other by the Kennedy Towing Line, Incorporated, owner of the steam tug Mary J. Kennedy, against the steam tug Transfer No. 14, the New York, New Haven & Hartford Railroad Company, claimant. Decree for libelant Gregway against the two steam tugs jointly, and damages to the Kennedy to be divided between the two companies.

Decree affirmed 11 F.(2d) 172.

Macklin, Brown & Van Wyck, of New York City, for libelant.

Foley & Martin, of New York City, for claimants.

INCH, District Judge. These two libels were tried together, as they depend for decision on the same facts.

The libelant owned the scow Saranac. This scow was damaged by being run into by the tug Kennedy. Accordingly libelant sued the said tug, and claimant impleaded the steam tug Transfer No. 14. The above relates to the first libel.

The second libel was filed by the Kennedy Towing Line, owner of the tug Kennedy, against the Transfer No. 14, claiming that the Kennedy was also injured, and that such injury was due solely to the carelessness of the Transfer No. 14.

The facts briefly are that about 6 o'clock, daylight saving time, in the evening of Au-

gust 1, 1923, a bright, clear evening, with plenty of light and no unusual circumstances as to weather or water conditions, the Gregway barge Saranac was lying safely moored, alongside the south side of Pier 5, East River, inside the slip, a short distance from the river end of the pier. There were other barges moored in this slip and on the other side of this pier. The masters of these various barges were seated near the end of the pier, enjoying the cool of the evening, and doubtless discussing over their pipes the crowded conditions of the East River and dangers therefrom. The master of the Saranac had departed after making everything safe, and did not return until later in the evening, when he found his boat had been sunk. In view of the facts of this accident, there was nothing that he could have done, had he been present.

The steam tug Kennedy had finished its day's work on the other side of the East River, and had come across to the Manhattan side, thinking she could find her usual berth for the night in one of the slips in that vicinity. The Kennedy came close to the end of the Piers 9 and 8, and discovered that the slips were crowded. She then, keeping her bow about 80 feet from the piers, proceeded to drop down almost at right angle with the end of the piers, towards 7 and 6, with the ebb tide, which was then flowing, occasionally making a few revolutions with her propeller, but substantially maintaining this position, her stem slightly upstream, until about opposite pier 6. The Kennedy is about 95 feet long. At this time, the tug Burro, with a tow, was coming up, about 250 feet from these Manhattan piers. The Transfer No. 14, with two railroad floats, one on each side, was also coming up, about 300 feet from these same piers. This Transfer No. 14 is one of the large railroad tugs of the harbor. It has two stacks, large horse power, and can tow these heavy railroad floats, loaded with freight cars, quite rapidly. It was going full speed.

The captain of the Transfer No. 14 is an experienced seaman, and so apparently is the captain of the Burro; but it is plain that these two captains, like many others, are accustomed, when the tide is ebbing, as it then was, to take this course quite near to these Manhattan piers and on the wrong side of the stream, in order to avoid some of the resistance of the down-coming ebb tide, rather than go out further in the river, where they belong, but where their progress would be slower and their engines have to work harder. The speed of the tug Burro is not important, as she was going slow; but the Transfer No. 14 was going "hooked up," and she was coming along fast.

The Transfer No. 14 overtook the Burro, which was at the time about 100 feet off the end of the Pier 5, and after passing her and her tow on the latter's starboard side, about 50 or 75 feet, slightly turned in again towards the piers and then straight ahead. The tug Kennedy all this time was in plain view to the Transfer No. 14, and I believe that the Transfer No. 14 would have been equally plain to a lookout at the stern of the Kennedy.

The captain of the Transfer No. 14 seeks to explain the collision by saying that he thought that "the Kennedy was going into a slip," but that she suddenly backed out across his course, too late to prevent the collision. He also explains his position on the wrong side of the stream by saying that there were a number of other vessels occupying that portion of the river which he ordinarily would have used, had they not been there. While there were other vessels in the stream, nevertheless the river is about a half mile wide at this place. He also testified (on direct):

"Q. After seeing the Kennedy, did you think she was going to interfere with your navigation? A. Not in the least.

"Q. What did you do after that? A. I watched the boats coming down the river, and looked astern to see how my stern was with reference to the tow, and when I again looked— I watched the Lackawanna tug pass, and then I saw the Kennedy almost in front of my float."

On cross:

"Q. You got no report from anybody that she was in front of you until the collision was about to happen; is that correct? A. Yes.

"Q. You were looking at the stern, to see if your car floats were clearing the Burro's tow? A. Yes."

It seems to me, therefore, that what the captain of the Transfer No. 14 really thought was that the Kennedy was going into a slip and would be out of the way before he got there, and that with this in his mind he carelessly concerned himself solely with safely passing the Burro and her tow, and in the absence of a lookout, and with his eyes towards the stern, when he again looked forward it was too late. His explanation as to the Kennedy backing out is based on the wish to believe, and it does not seem to me that the carelessness of the Transfer No. 14 can be doubted. As to his explanation in regard to

the course of the Transfer No. 14, I think it is apparent that both the captains of the Burro and the Transfer No. 14 were over on the wrong side, because of one of those customs that grow up and are contrary to ordinary prudence and care. If nothing happens, there is no criticism; but, if something happens, an endeavor must be made to explain that they were forced to go over on the wrong side.

Such a custom carries its own penalty, as disobedience to any safety rule of the river, based as they are on experience, often carries a penalty in the shape of an accident when something goes wrong. I find, therefore, that the Transfer No. 14 was careless, that such negligence was part of the proximate cause of the injury to the scow, and she is liable to the libelant.

The case of the Kennedy remains to be decided. If the Transfer No. 14 was careless, and yet the tug Kennedy also was careless, and contributed to the injury to libelant's scow, they would both be liable to the owner thereof. There would, however, be a different basis of liability between them as to the damage to the Kennedy.

I fail to find that the tug Kennedy did more than was testified to by her captain. She was in plain sight and rightfully on that side of the stream. She was not backing out, nor was the action of the captain of the Kennedy in ordering full speed ahead when he saw a collision was imminent an improper maneuver. From the moment of the collision the Kennedy was helpless. To have expected the engineer of the Kennedy under the circumstances to have faced death by remaining at his post would not be common sense, and I believe him when he said that he believed he was in great peril.

The port railroad float of the Transfer No. 14, which has a rake bow, rode up on the stern end of the tug Kennedy, temporarily thrust it under, and the force of the blow pushed the Kennedy's bow around. When the captain of the Kennedy saw that he was going to be run down, he turned his wheel hard to starboard, and ordered full speed ahead in an effort to circle out of the way of the on-coming float. It was too late, however, although such action probably saved the tug from more serious damage. The result was that the collision completely put out of business the steering gear of the Kennedy, demolished the house, and the engineer, having believed that his life was in danger, after obeying the order of the captain to put the engines full speed ahead, had sprung to the upper deck, and from there stepped, with the aid of a floatman, to the car float, and so was no longer present in the engine room. Consequently the Kennedy made a sort of circular dive straight for the space between Piers 6 and 5, and, passing close to the end of Pier 6, ran into the barge of libelant, which was lying alongside of pier 5 near the river end.

I have very carefully considered this case of the Kennedy, and it would seem at first glance that she might be an unfortunate victim of the sole carelessness of the Transfer No. 14, and certainly after the collision she was a mere instrument, so to speak, used jointly by those who caused her condition to inflict the damage on libelant's scow; but, after considering all the evidence, it seems to me that the feeling of probability that this collision did not occur because of the carelessness of the Transfer No. 14 alone is confirmed by the proof. The Kennedy was drifting down almost broadside, and she had no lookout at her stern. The captain was in the pilot house, and a lookout was at the bow. Both the captain and the said lookout testified that they were concerned with looking for a place to berth, and the first that the captain knew of the danger was that this lookout on the bow near the pier ends "hollered, 'Look out for the car floats coming astern.' Q. Did you look? A. I looked. Q. What did you see? A. I saw the car floats coming head on."

The collision was then inevitable. It might be suggested that, in the position the Kennedy was, a lookout on the bow was as good as a lookout on the stern, and it is this suggestion that tends to mislead. The rule is that a competent lookout, charged with that sole duty, should be stationed where he can best see. Hughes on Admiralty (2d Ed.) p. 296; The Nevada, 1 S. Ct. 234, 106 U. S. 154, 27 L. Ed. 149; City of Philadelphia v. Gavagnin, 62 F. 617, 10 C. C. A. 552; The Tillicum (D. C.) 217 F. 984.

There is no hard and fast rule as to the station of a lookout, except that he should be present where he can "look out" for danger, and be in a position where the best and quickest reports of such apprehended danger can be made. The failure to have a lookout in any particular place, where vessels are taking all the necessary precautions and are plainly in no danger, with adequate room to pass, may become immaterial, and ordinarily the place of a lookout would be at the bow, although it might be necessary to have one at the stern also.

Applying these general rules to this case, it seems to me that there was a big difference,

so far as the safety of the Kennedy was concerned, between having this lookout at the bow and one at the stern. The captain could have taken care of ordinary matters at the bow, but the danger to be apprehended was from traffic carelessly violating the rule of the stream, and coming up the wrong side, such as the Transfer No. 14 was, and such as was often done in a crowded stream like the East River. Another's carelessness is to be apprehended more often than one's own.

The captain of the Kennedy says that his bow was about 30 feet from the pier end. The tug Kennedy is about 100 feet long. Consequently, taking these minimum figures and allowing for the angle, if a lookout had been placed at the stern, he would have been approximately 130 feet out in the stream. Even these figures would have afforded the lookout a plain view of the Transfer No. 14 coming up and around the Burro, even assuming that she was little more than that distance from the pier ends of 5 and 4. The Transfer No. 14 saw the Kennedy. I also believe the Kennedy was somewhat further out.

As it was, with the lookout at the bow, close to the pier, and the Burro and tow hiding from him in that position the fast-approaching Transfer No. 14, outside of her, it was not until the Transfer No. 14 fully appeared close to the Kennedy that this lookout saw her and shouted his warning, too late to avoid a collision, although the captain of the Kennedy immediately commenced a maneuver that, with a few seconds' earlier notice of his danger, which a lookout at the stern could have given, undoubtedly would have avoided a collision.

Having this recognized duty in mind as to having a lookout in a proper place, can it be said that it was a prudent and ordinarily safe thing for the Kennedy to do not to have a lookout at the stern of the Kennedy under such circumstances? I do not believe that it was, and I believe a failure to have such a competent lookout at the stern was carelessness on the part of the Kennedy, and that this carelessness directly contributed to the collision, which was the cause of the injury to the Kennedy, and completed the proximate cause of the injury to libelant's scow.

In view of the foregoing, I direct a decree in favor of libelant Gregway against the Transfer No. 14 and the tug Kennedy jointly. As to the damages to the Kennedy, I direct that same be divided, between the Kennedy Towing Line, Inc., and the New York, New Haven & Hartford Railroad Company.