**IRA S. BUSHEY & SONS, Inc., v.
UNITED STATES.**

Civil Action No. 7804.

District Court, E. D. New York.

June 7, 1948.

Foley & Martin, of New York City (Christopher Heckman, of New York City, of counsel), for plaintiff.

J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y., and Burlingham, Veeder, Clark & Hupper, of New York City (Eugene Underwood and Benjamin E. Heller, both of New York City, Esq. of counsel), for the United States.

GALSTON, District Judge.

This case involves damage to a wooden pier owned by the plaintiff. It lies on the northwesterly side of Gowanus Creek, known as Bushey Pier No. 7. On June 13, 1945 the pier was damaged by the tanker A. C. Dodge, which was operated and controlled by the plaintiff.

On the opposite side of Gowanus Creek, lying alongside Pier A of Sullivan's Ship Yard, was El Mundo, then owned and operated by the United States of America.

It is the claim of the plaintiff that the wash from the propeller of that steamer struck against the starboard bow of the A. C. Dodge and caused the Dodge to sheer into the slip between Piers 7 and 8. In that same slip at the time there were a spile driver and men at work. Those in charge of the Dodge feared that if they came in contact with the spile driver they might injure the men and damage the spile driver. Accordingly the engines of the Dodge were ordered full speed ahead and the Dodge was given a right wheel to get her out of the pocket into which she had been forced by the wash from the El Mundo. In this maneuver the outside end of the pier was struck and damaged. The action against the United States is brought under the Federal Tort Liability Act, 28 U.S.C.A. § 921, et seq.

The Dodge is a coastwise oil tanker with a length of 213.7 feet, a width of 37.1 feet, an inside depth of 14.3 feet, a horse power of 805, and a draft of 14 feet. The weather was overcast with a light rain and a light sou'heasterly wind, but visibility was good. The tide was ebb at about half a knot from Gowanus Creek toward New York Bay.

The El Mundo is a vessel of considerable horse power—5500. It is 405 feet in length, 53.1 feet in width and 27.4 feet in depth. It is equipped with a single four bladed propeller 19 feet in diameter, having a 24.75 foot pitch.

Sullivan's Pier A is about 250 feet across Gowanus Creek toward Bushey's Pier 7.

From the conflicting testimony in the case, particularly that concerning how far the propeller wash from the El Mundo carried into the Creek, I accept the version given by the officers of the Dodge. The El Mundo was lying bow in on the northeasterly side of Pier A with her stern about 35 feet inside of the river end

of Pier A. The agents of the defendant were conducting a dock trial of the El Mundo's engines, and at times her propeller was turning at the rate of from 35 to 40 revolutions per minute. When the DODGE entered Gowanus Creek she stopped her engines a short distance before reaching Pier 7 because a tug with a carfloat in tow was maneuvering to enter the slip adjoining Sullivan's Pier A to the southward. This tow, of course, blocked the passage for a considerable width of Gowanus Creek. After the tow entered the slip the Dodge's engines were brought to slow speed ahead, and she was maneuvered toward the end of Pier 7. It was then that the wash from the El Mundo struck her starboard side. This caused a sheer to her own port, and toward the slip between Piers 7 and 8, to which reference has heretofore been made. That the Dodge sought to avoid collision with the vessels in the slip on which men were working seems entirely justifiable. In order to effect that objective it was necessary for her first to be hooked up to full speed ahead with a hard right rudder. She would have avoided contact with the pier had it not been for the effect of the El Mundo's wash. To reduce the force of the collision with the pier the Dodge's engines were reversed. But finally the Dodge did strike the southwesterly corner of plaintiff's Pier 7.

The duty imposed upon a vessel tied to the pier to passing navigation is well recognized in The Nevada, 106 U.S. 154, 1 S.Ct. 234, 238, 27 L.Ed. 149. It appeared that the Nevada had been moored in a slip on the North River and was about to start on her voyage to Liverpool. She had given signals with bells and whistles, and at the instant, just before her screw was put in motion, a steam-tug entered the slip with a tow. The propeller of the Nevada began to revolve and produced a suction which led to one of the vessels of the tow being struck by the propeller. On defining the obligation of the Nevada the court said:

"The ocean steamer is one of the great inventions of the century, and one of the advanced instrumentalities of modern civilization; but whilst it may freely exercise its powerful propeller and sport its leviathan proportions on the ocean or in deep and open waters, it is justly required to observe extraordinary care and watchfulness when surrounded by feebler craft in a crowded harbor. Under some circumstances, and within a limited space, it may even be required to dispense with the use of its ordinary means of locomotion, and resort to the employment of towage or other safe and quiet means of changing its position and effecting its necessary movements. * * *

"However, we do not mean to say that, in the application of these principles to the present case, it was the duty of The Nevada to remit the use of her propeller in leaving her place in the slip where she lay. The court does not find her in fault for using it, but for not having a lookout at her stern, and on the side next to the slip, who could have seen the breaking away of The Hart and The Kate Green from their fastenings and, by giving timely alarm, could have averted the disaster by a momentary stopping of The Nevada's engine. In such a place, and in the midst of such a crowd of vessels as then filled the slip, since she did put her propeller in motion, she was bound to use the utmost caution and circumspection in order to avoid doing injury. The least that could be expected of her was a constant lookout at every part. But the court finds that 'No one on board of The Nevada knew of the parting of The Hart's lines, or of the swinging of The Green, or of the accident, until after they arrived at Liverpool. If a man had looked from her deck over her side into the slip, he could not have failed to see what was going on all the time, from the first movement of the propeller, and before, until she got out'. And the court further finds that 'There was abundant time after the breaking of the fastenings of The Hart, and after The Green began to swing, and after the hail of her master, to have stopped the propeller before the collision.'

"This, as it seems to us, settles the case and amply justifies the conclusion of law made by the court below, that 'The Nevada was in fault for not keeping a sufficient lookout aft and on the side next the slip, and in not seeing The Kate Green when

she came in, or as she swung over, and in not stopping the propeller in time to avoid the collision.' "

In this court, Judge Campbell, in The Caroline M. Wade, D.C., 290 F. 607, 608, considered the obligation of a transfer tug with her bow against a float or float-bridge to moving vessels. Judge Campbell wrote:

"The transfer tug was bound to exercise care and not interfere unnecessarily with navigation, and even although the said transfer tug was within her right when the river was clear to put her head against a rack or float and operate her engine at full speed, no such right exists when a tug with a tow is passing, because it endangers the safety of a passing vessel, and that act constituted negligence on the part of the said New York, New Haven & Hartford Railroad Company, respondent.

\* \* \* \* \* \*

"The transfer tug No. 10 had no right to endanger navigation by her quickwater, and should have reduced the speed, if she did not stop her engine, so that the Wade and her tow could safely pass through the comparatively narrow opening of the draw in said bridge.

"Some expert testimony was offered by the respondent railroad to show that the quickwater could not be felt for more than 50 feet from the stern of the tug, but I believe the positive evidence offered by the master and the lookout of the Wade that the Wade and Leach did feel quickwater on the day in question. I therefore find that the respondent New York, New Haven & Hartford Railroad Company was negligent, in not slowing down or stopping the engine of transfer tug No. 10 to permit the Wade and the Leach to be navigated in safety, and was solely responsible for the damages suffered by the Leach."

In the case of The Dorothy, 2 Cir., 189 F. 40, it appeared that the steamship was lying aground in Newton Creek and endeavored to get herself free at high tide by means of her propeller and a hawser to the shore. The propeller revolution and the resulting suction caused damage to one of the boats in the tow of the Wyomissing. In the circumstances the steamship was held at fault for not stopping her propeller.

Now while it appears that a boatswain was stationed on the bridge of the El Mundo as a lookout, charged with the duty to notify the chief mate of the approach of any vessel, there is nothing in the record to show that anything was done to stop the El Mundo's engines at or about the time of the accident.

One of the outstanding facts in the case is the narrowness of the fairway, and there should have been recognition of danger by those in control of the El Mundo. Other accidents involving similar conditions in Newton Creek are reported in the books. See, in particular, Hedger Transportation Co. v. Tug "Ideal", D.C. 78 F.Supp. 384, 1944; McLain Line v. SS. Carreta, 1944,[1] also Red Star Towing & Transportation Co. v. Steamtug McGuirl, 1925.[1]

I am forced to conclude that the fault was with the El Mundo, nor was there any contributory negligence by the Dodge. Certainly the record does not establish the contention of the defendant that the Dodge's own navigation —unaffected by propeller wash—caused the contact with the pier. It is true that there was no lookout on the Dodge. The duty of a lookout would not seem to require him to watch for propeller current from a slip; but rather to warn the bridge of vessels in the fairway or emerging from piers or slips, or of floating objects, ice floes, etc., likely to affect the navigation of his own vessel. See The Buenos Aires, 2 Cir., 5 F.2d 425; The Catalina, 9 Cir., 95 F.2d 283; New York & Oriental SS. Co. v. New York, New Haven & Hartford R. Co., D.C., 143 F. 991.

The plaintiff may have a decree.

Concurrently with the filing of this opinion appropriate findings of fact and conclusions of law will be filed.

---

[1] No opinion for publication.