## THE CITY OF NEW YORK.

### STEVENS et al. v. THE CITY OF NEW YORK.

(Circuit Court of Appeals, Second Circuit. February 7, 1893.)

1. ADMIRALTY—APPEAL.

Although the opinion of the trial judge in an admiralty case will not be disturbed on appeal as to questions of fact depending upon the credibility of witnesses examined in his presence unless there is a decided preponderance of evidence the other way, his decision rendered without an opinion cannot be reviewed conformably with that rule, and, on appeal therefrom, the appellate court will decide such questions of fact as best it may on reading the record.

2. COLLISION—TUG AND STEAMER AT PIER.

A tug had instructions from the officers of a steamship company to assist one of its steamers in getting into her slip, and, in so doing, take a position under her starboard quarter. After the steamer got part way into the slip, using her propellers from time to time for that purpose, the tug came alongside, signaled with her whistle, stopped her engines, and lay alongside, waiting for a line to be passed, with her stern close to the steamer's propeller, her approach not having been noticed by the steamer's crew. While in this position the tug was sucked under and sunk by the starting of the steamer's starboard propeller. *Held*, that the tug was negligent in assuming such a position, and that the steamer was not liable.

Appeal from the District Court of the United States for the Eastern District of New York.

In Admiralty. Libel by Stevens and others against the steamship City of New York for collision. Decree for libelants. Respondent appeals. Reversed.

H. G. Ward, for appellant.
Jos. F. Mosher, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. The learned district judge who heard this cause in the court below did not express any opinion in deciding it upon the facts or law of the cause, and we are wholly uninformed of the reasons which led him to conclude that the libelants were entitled to recover. In controversies involving questions of negligence there is usually less difficulty in applying the rules of law to the facts than in ascertaining what the facts really are. In the present case the findings of the trial judge, in whose presence the important witnesses for the parties were examined, would have been most persuasive with this court in determining the facts, and probably would have been controlling, because the testimony is conflicting, and its weight and force depends upon the credit to be given the witnesses. The demeanor of the witnesses is a material and important part of the evidence, which cannot be sent up with the record; and, because this is so, the rule prevails in appeals in

admiralty that the opinion of the trial judge will not be disturbed upon questions of fact, depending upon the credibility of witnesses who were examined in his presence, unless there is a decided preponderance of evidence the other way. Under the present circumstances, we must decide all questions of fact depending upon the credibility of witnesses as best we may upon reading the record.

It has been urged for the appellees that the decision of the district judge, without an opinion, is equivalent to the general verdict of a jury upon the issues of fact, and is necessarily a decision in favor of the libelants upon all litigated questions of fact necessary to a full recovery. We cannot for a moment assent to this proposition. How can a reviewing court know what questions of fact entered into the decision until it is informed what the judge decided as matter of law? We can hardly suppose in this case that the learned judge regarded the steamship as an insurer of the safety of the injured tug; but if he did, in the view which we take of the law, his decision could not involve any finding upon the most essential facts of the case.

The facts, as upon the record we deem them to be, are these: On the 8th day of October, 1890, the steamship City of New York arrived at the port of New York from Liverpool, and the master of the steam tug Viking, expecting that the steamship would require assistance in getting into her berth, which was the slip between piers 42 and 43, North river, applied for employment to the superintendent of the Inman & International Steamship Company, the owners of the steamship. He was told by the superintendent that he might assist with his tug, and, according to his testimony, he was told by the superintendent to use the tug on the starboard quarter of the steamship. At that time the steamship was on her way coming up the river from the Battery. The tug proceeded a short distance down the river, and laid off, awaiting the arrival of the steamship, until after the steamship had passed by on the starboard hand. When the steamship came opposite her berth, she stopped her headway, and got her bow into her own slip, at the end of pier 43. Her stern projected further out into the river, and was about abreast of midway between piers 40 and 41. She fastened a headline, and also a breastline, to pier 43, leading from her port side, and commenced using her propellers for the purpose of swinging her stern up the river against the tide, and straightening into her berth. The tide at this time was ebb. She lay in this situation some little time, working a little into her slip, using her starboard propeller to back, and her port propeller to go ahead, and being assisted on her port side by the tug Pulver. Two other tugs were lying on her port side waiting to assist her. While the steamship was in this situation, and was thus maneuvering, and during a momentary interval in which her propellers were not in motion, the Viking came up, and went under the stern, and towards the starboard quarter of the steamship. The Viking was 90 feet long, and 20 feet in width. There was a schooner lying at the end of pier 41, and a steamer lying on the northerly side of the pier, and in the position of the steamship there was not sufficient room between her and pier 41 to

enable the tug to push her at right angles, or to assist her with any advantage without being made fast to her by a line. Beyond pier 41, the slip between that pier and pier 42 was clear. When the tug passed under the stern of the steamship she entered the triangular space between the steamship and the end of pier 41, and tooted her whistle to indicate her presence, and attract the attention of those in charge of the steamship. She then ran her bow up to the steamship's side and stopped, intending to pass a line to the steamship, and waited for some of the steamship's crew to appear and make it fast. At this time her stern was opposite and about 20 feet away from the starboard propeller of the steamship. Those in charge of the steamship were at the time busy looking after the lines and tugs on her port side, and did not hear the whistle or know of the presence of the Viking. About this time, and while the Viking was lying, with her engine stopped, in the position stated, the steamship had occasion to use her starboard propeller, and it began to move, and the Viking was drawn against it by suction, and so badly cut by the blades that within a few minutes she sank. The master of the Viking testifies:

"We laid there a moment, and nobody came for the line, and the first thing I knew the ship started her starboard propeller ahead. I immediately rang to go back with the jingle bell, full speed; but the suction being so great, before we could get back far enough to clear the propeller, it had sucked us under sideways."

The master had frequently assisted ocean steamers to make their berths, knew how they maneuvered on such occasions, and knew that in the situation of the steamship she would have occasion to use her propellers at short intervals from time to time. While his tug had been lying astern of the steamship the latter had stopped her propellers momentarily several times, and then put them again in motion. The evidence does not indicate that there was any arrangement or understanding between the two vessels by which the Viking was expected to take her position at any particular place on the starboard quarter, or begin her active services at any particular time. Her master testifies that, according to the customary way of performing such services, he was to determine for himself when and where he should place his tug in position, without waiting for orders from the steamship.

Upon these facts we are unable to see how any negligence can be imputed to the steamship, and think that the tug received her injuries by reason of her own want of proper care. There is no rule of law which compels a steam vessel to forego the use of her motive power, or its appliances, in executing her ordinary movements and maneuvers. Her propellers, though dangerous to other vessels or objects coming in contact with them, are not outlaws. They are necessary instrumentalities for the purposes of commerce and navigation. The law merely imposes upon those who use them the obligation to do so without causing unnecessary harm to others, and, in this behalf, to exercise all reasonable care and circumspection in order to avoid doing injury. The Nevada, 106 U. S. 154, 159, 1 Sup. Ct. Rep. 234. The measure of care to be exercised by a steamship in the use of her propellers differs under different circum-

stances; and the same rule of law which would exonerate an employer from the consequences of an injury to a servant caused by a risk inherent in the service which the latter was hired to perform will exonerate a steamship from responsibility for an injury caused by a similar risk received by a tug while in its employ. It is the duty of the employer to use due care to avoid exposing the servant to extraordinary risks which the latter cannot reasonably anticipate; but he is not bound to provide against the risks which are necessarily incident to the service to be rendered. These are implied conditions of the contract of hiring, and there is no reason why they are not as applicable to the relation of steamship and tug as to that of ordinary master and servant.

In the present case the tug engaged to assist the steamship for an occasion in which all who were to participate knew that it was usual, and to a greater or less degree indispensable, for the steamship to use her engines and propellers, and in which she would be required to use them intermittently, but more or less constantly, throughout the operation of getting into her berth. None of them supposed, or had any right to suppose, that the steamship would remit the use of her propellers awaiting the arrival or any of the subsequent movements of the tug. In engaging for the service the tug held herself out as experienced and competent to facilitate the operations of the steamship, without embarrassing her unnecessarily, and at the same time as competent to exercise due care for her own safety during the work. The steamship on her part undertook not to expose the tug to any extraordinary risk while engaged in the service. Those being the implied conditions of the contract, the steamship had a right to assume that the tug would exercise reasonable care for her own safety, and would not expose herself to peril by going unnecessarily into too close proximity to the propeller while it was in motion, or when it was likely to be put in motion. Consequently there was no breach of obligation upon her part in putting her propeller in motion when and as she did. We do not say that it would not have been her duty to stop the movement of her propeller if she had been aware that the tug had gone dangerously near it, and was lying there with her engine stopped. Whether it would have been or not, it suffices that this is not such a case. The steamship did not know of the tug's presence dangerously near the propeller. If she ought to have known from the tooting of the tug's whistle that the tug was ready to begin work, she was not bound to know, and did not have any reason to suppose, that the tug had placed herself in a critical and perilous location.

The master of the tug, acting on his own judgment, chose a place to wait for the steamship to take the line where the tug would be exposed to just such an accident as happened in case the steamship should use her starboard propeller. He not only put her dangerously near the propeller, but he stopped her engine, so that she was not under full control. He did this when he knew, or was bound to know, that the steamship would shortly have occasion to use her propeller. He did this also when he knew that the steamship was not aware that his tug was ready to begin work, because no one from the steamship had responded to the signal

given by the tug—the tooting of her whistle—as she was approaching the steamship. The accident to the tug was caused by his negligence in going to and remaining in an unsafe place, when he should have stopped her at a safe distance from the steamship's propeller. He could have done so either before she got so near on her way to the steamship's starboard quarter, or in the slip beyond pier 41, where she would have been perfectly safe; and he should have kept her there until some one appeared on the steamship to take the line. The case is one where a vessel, having agreed to do a particular duty, and familiar with all its ordinary incidents, thrust herself unnecessarily into a position where she was injured by just such a risk as she should have anticipated.

The decree is reversed, and the cause remitted to the district court, with instructions to dismiss the libel, with costs of that court and of this appeal.