### MERCURIO v. LUNN et al.

(Circuit Court of Appeals, Second Circuit. April 4, 1899.)

#### No. 539.

1. MASTER AND SERVANT—INJURY TO EMPLOYE.

In lowering a boom used in discharging vessel in order to remove the block from the end thereof, either of two methods is followed. The boom being at the time up, the fall that is around the drum of a winch which has been used to elevate the boom may be payed out either by altering the link motion of the winch by the reversing lever, and admitting the steam, whereby the drum will revolve in a reverse direction to that in which it revolved when the boom was hoisted, or, the steam having been shut off when the operation of elevating ceases, the winch becomes stationary, and the fall, its bight being kept well in hand, is gradually surged off. A winchman, after the boom had been raised preparatory to lowering it, on being so directed, stopped the winch by turning off the steam. Thereafter one of the stevedores began slacking the line, so that it could be surged off, without the aid of the winch, and the winchman, after this operation began, believing that the rope would hold the boom, left the winch. He had been detailed only to act as such winchman. *Held* that, as there was no apparent necessity for the winchman remaining at the winch, and no lack of ordinary prudence in his leaving, such act was not negligence.

2. SAME—DEFECTIVE APPLIANCES.

After a boom used in discharging a vessel had been raised to the mast by the steam winch, the steam was shut off from the winch, and the

stevedores attempted to lower the boom, after taking turns of the fall around the drum of the winch, by "surging off." The boom became unmanageable, and fell, and injured libelant. One of libelant's witnesses testified that the fall was caused by the winch reversing. There was no evidence that any part of the winch gave way, or that any cog slipped, or that the reversing lever was moved after the operation of elevating the boom had ceased, or that the steam was turned on. Libelant's testimony, which was unsatisfactory, was to the effect that the weight of the boom caused the drum to revolve, and the machine to operate in a direction the reverse of that in which it was set to go. Experts testified that, when the steam had been turned off at the end of the hoisting operation, to disturb the mechanism of the winch many tons of weight would have to be placed upon it, unless some accident happened to the gear, and that nothing could cause the drum to turn in the opposite direction but the winch becoming ungeared, or some one shifting the brake in reverse order, and turning on the steam. *Held*, that the evidence failed to show any defects in the winch causing the injury, but that the accident happened because that in the process of surging off the rope got beyond the control of the men paying out the fall.

Appeal from the District Court of the United States for the Eastern District of New York.

This cause comes here upon appeal from a decree of the district court, Eastern district of New York, awarding to the libelant $5,-000 for personal injuries received by him on board the appellants' steamer Cleveland in the port of New York, July 1, 1897.

J. Parker Kirlin, for appellants.

Francis L. Corrao, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. A brief memorandum of the district judge states that, in view of the introduction of some additional testimony, an opinion, which had theretofore been handed down, was withdrawn, and is no longer a part of the proceedings in the action. The record therefore does not contain any findings of fact by the district court as to any one of the controverted questions of fact. In consequence, it will be necessary to review the evidence in some detail. Stevens v. The City of New York, 4 C. C. A. 268, 54 Fed. 181. The libelant was in the employ of a firm of stevedores who were engaged in discharging the vessel, and was injured by the fall of a derrick boom, which was being lowered to the deck, in order that a block, which was the property of the stevedores, might be removed. So much of the cargo as was to be left in the port of New York had been discharged, and there were on board at the time, in the vicinity of hatch No. 1,—where the derrick was located,—the libelant, two of his fellow servants (Totrona and Palese, gangwaymen), the first mate, and one of the sailors, who had been running the winch, and is spoken of in the testimony as the winchman. The method adopted for removing the block from the end of the derrick boom is concededly a proper one. The libelant contends that it is the better method. The course of procedure is as follows: A fall leads from the boom (near its end) to the mast (near its head), and through a block down to the winch. A sufficient number of turns are made around the

drum, and, the winch being set in motion, the drum turns so as to haul on the fall, thus elevating the end of the boom and slackening the chain span, which runs from the mast to the boom end. The boom being up, and the chain slack, one of the men climbs the rigging, and removes the pin from the chain. The boom is then supported only by the fall, and, as that is payed out, the boom descends. A fall that is turned around the drum of a winch, and which has been used to elevate the boom, may be payed out to lower the same in one or other of two ways; either the link motion may be altered by the reversing lever, and, steam being admitted, the drum will begin to revolve in a reverse direction to that in which it revolved when the hoisting was going on, or else, the steam having been shut off when the operation of elevating ceased, the drum ceased to move, and the fall, its bight kept well in hand, is gradually "surged off" as if the turns had been taken around a fixed cylinder. Libelant had climbed the rigging, and had drawn the pin from the chain span. He then returned to the deck, taking his position on the port side of the foremast on the bridge deck, to clear the rope for the man who was lowering the fall. The boom had descended but a little way, when its speed suddenly increased, and it came down with a run into the crutch. It was fastened to the mast with a gooseneck; and the effect of the fore-end striking so heavily into the crutch was to cause the heel to rebound, and lift the gooseneck out of the sockets. The boom struck the libelant, inflicting severe injuries. There is no controversy as to any of the facts above stated.

The negligence charged in the libel is:

"First, in that the said winchman negligently and carelessly left all of a sudden the said winch which he was operating, contrary to his duty, by reason of which the said winch, being left uncontrolled and unmanaged, made the boom * * * fall precipitately; * * * and, second, in that respondents * * * failed in their duty to securely and safely place and fasten the said boom," etc.

There is a conflict of evidence as to precisely what passed between the mate and the stevedore's men when the latter asked to be allowed to lower the boom in order to get the block. It may, however, be assumed that he allowed them to undertake the operation, and that he detailed the winchman, who, having finished his work, had left the winch, to render such service at the winch as the operation called for.

The first witness called for the libelant (first, not in point of time, but in logical order) is Totrona, the gangwayman. From his evidence it appears that he and the winchman took their positions at the winch; the former on the port side by the drum, the latter on the starboard side. Totrona took five turns of the fall around the drum, and when he was all ready told the winchman to heave up the boom. The winch was started, and the boom raised up along the mast, slackening the chain span, whereupon Totrona told the winchman to stop, and he stopped the winch by turning off the steam. He could stop it in no other way. This situation must have continued some little time, long enough for libelant to remove the pin, and return to the

deck. Indeed, libelant himself testified expressly that the boom did not begin to descend until he came on deck. The first half of the operation was now concluded,—a part of the operation which invariably required the running of the winch, since without the application of the steam power the heavy boom could not be raised. The other half—lowering the boom—might be performed, as was said before, either by reversing the winch, and running it in the new direction, or without its aid as a moving mechanism. Totrona settled the question by beginning to slacken the line (so that it could be surged off). The winchman waited till this operation began, and then went away. The witness Totrona says, "After we began to lower the derrick, the winchman left, believing that the rope would have held the boom." We are unable to see any negligence on his part in so doing. He had been detailed to act as winchman, had so acted, discharging his duties properly, until the time came when it was determined that the operation of lowering should be concluded without further movement of the winch, which was at that time stopped, with the steam cut off. There was no further need for his services as engineer of the winch. He had not been assigned to assist in surging off the fall. No one supposed that with five turns on the winch it would require more than Totrona to keep it properly in hand during the descent. He had handled it unaided during the elevation. There was no apparent necessity for the winchman's remaining at the winch, and no lack of reasonable and ordinary prudence in his leaving. Totrona testifies that he told the winchman to remain; "to stay at the winch, and not to leave it." Witness further says that he so told him when there was as yet not much weight on the winch, and no indications of trouble; that it was usual for the winchman to remain at the winch; that he did not know the winchman intended to go. If Totrona did not anticipate any trouble, and had no expectation that the winchman was about to go, it is difficult to credit his statement that he told him to stay. Elsewhere Totrona says that, when the winch was moving the other way, the winchman being then somewhere forward, where he could not see him, he called to him to come back, and he also says that he gave the order only once. It is, of course, immaterial whether Totrona asked him to stay or not. If reasonable prudence required him to stand by the winch, he would be negligent in leaving it; if, on the other hand, his duties ceased when, after elevating the boom, he had stopped the winch, and it had been decided to lower by surging off, and not by any further motion of the winch, then there was no negligence in his leaving, although Totrona, for no explainable reason, asked him to stay. It may be remarked that the testimony of the three Italian witnesses is most unsatisfactory and unpersuasive, a circumstance due in part to their imperfect knowledge of English. They were examined without an interpreter. Libelant says that he understands English "little bit, not much," and that he can speak it a little better than Totrona, for which reason he was spokesman in the interview with the mate. It is manifest from the answers that some of the questions were not comprehended. And many of the important questions on the direct examination were leading ones. Totrona, proceeding with his nar-

rative, testified that when the boom was at about an angle of 45 deg. with the mast, it "was too heavy"; that the "winch turned the other way [reversed], dragging him along with the line"; that he called to the winchman "to put on steam," and could not hold the line any more. There is no suggestion anywhere in the evidence that any part of the machine gave way, that any cog slipped, that it got out of gear, or that the reversing lever was moved after the operation of elevating the boom had ceased. The contention is that the weight of the boom alone (1,500 pounds, part of which was borne by the gooseneck) caused the drum to revolve, and the whole machine to operate in a direction the reverse of that in which it was set to go. The entire testimony of Totrona upon this question of a reverse turning is as follows: Direct. "Q: When it became too heavy, did the winch turn? A. Yes, sir. Q. What made the derrick come down after that? A. The winch made the boom fall down. * * * As soon as he [the winchman] went, the winch began to turn. Q. Did the boom come down because the winch was turning, and you could not hold the line any more? A. Yes, that is it. It was dragging me along the line." Cross: "Q. When you saw this winch turn around while you were holding the rope, did it turn towards the bow or towards the stern? A. Towards the stern." It is, of course, possible that the operation of "surging off" may be so conducted that at the critical point, when there is an increase of dead weight, some sudden jerk, caused by momentary carelessness, in conjunction with moisture or grease on the rope, may cause the load to get such an advantage of the man handling the fall that he cannot recover it. This was the case on The Miami (recently decided in this court; March 1, 1899) 93 Fed. 218. And when a rope is running off a drum with a constantly increasing rapidity it may well be that an observer, excited with the effort to prevent disaster, will find it difficult to determine whether the rope alone or rope and drum both are moving. The inherent improbability of Totrona's narrative is made clear by the testimony of claimant's witnesses. Townsend, a stevedore of many years' experience, who showed himself to be entirely familiar with the structure and operation of winches, testified that, when the steam had been shut off at the end of the hoisting operation, "to destroy or disturb all the mechanism of the winch you would have to place many, many tons of weight on it," unless it runs out of gear by any accident, or a cog becomes unshipped. He added, on cross-examination: "I don't think any experienced engineer would say that winch ever moved in an opposite direction unless it became ungeared, unless the cog flew out from the double-barrel spindle, and ungeared the winch, or unless somebody reversed the brake, and turned the steam on." And to a question by the court: "Nothing could cause the drum to turn in the opposite direction but the winch becoming ungeared, or somebody having shifted the break in reverse order, and turned the steam on." Mancor, an engineer and surveyor to Lloyds' Register, who has had special experience in the manufacture of winches, testified to the same effect.

To meet this expert testimony, libelant called Fitzsimmons, a longshoreman and foreman of the gang in which he and Totrona

had been working. This witness testified, "If the steam was tight, and the valve was tight, nothing could reverse the winch," but that, if the winch were old, and the steam valve were not tight, the weight of a boom would reverse the winch, where the steam was turned off. It is difficult to understand how this could be. If the steam valve leaked, one of two things would happen; either steam would pass from the storage side of the valve to the cylinder in which it was to do its work, or it would escape out of the machine altogether into the open air. In the first case the tendency will be to set the winch in motion,—forward if it be set that way, and backward if it be reversed. In the second case the pressure on the piston will be reduced, perhaps, if the leak be great enough, to such an extent that the winch will not lift its load. The proposition contended for here, however, is this: Steam admitted to the full extent of the valve aperture through the open valve will drive the machine so that it will lift; but if it comes through the same aperture in such scanty stream as may find its way through a leak it will operate, without any change of the reversing mechanism, to drive the machine in a reverse direction. No explanation of this singular phenomenon is found in the record. The witness Fitzsimmons, who was recalled subsequently, and then swore that this particular winch leaked (a fact he did not testify to when he was first examined), undertook to give an explanation, which serves only to disclose his evident lack of any intelligent conception of the structure of the machine. The following excerpt will sufficiently indicate the character of his testimony (he is describing the effect of a leak in the valve that is turned on to let steam to the winch): "You go ahead and hoist the draft up, and put on the steam. When your draft gets up,—the weight of the draft,— you have got to keep a little steam on. If you don't, the draft will come down on deck to you. You have to keep a little steam on to hold the draft, because, if you don't turn off the steam on a steam winch— I don't say the winch will come back because the piston rod,—but the barrel of the winch will come back by the weight that is on the boom; the barrel of the winch will reverse." We give greater weight to the testimony of Townsend and Mancor, and of Corbitt, second engineer of the Cleveland. The latter witness testified that a leak between the boiler and the stop valve would have no effect at all on the winch; that a leak between the stop valve and cylinder would tend to heave it up, if the winch had been put to heaving up, and the work had been stopped there, and the gear had not been altered; and that, if it was left geared to go down, it would go down if the steam leaked.

Totrona's statement that the barrel of the winch moved in a reverse direction, which is so utterly irreconcilable with the credible expert testimony, is wholly uncorroborated. The libelant, by affirmative answers to six successive leading questions, put by his counsel, testifies that from the place where he was standing when he was slackening the rope for Totrona he could and did see Totrona, and saw the winch turning the other way; but elsewhere he twice states that he was on the bridge deck, 10 feet from its edge,

with the winch on the main deck, 10 feet below; that he could not see the winchman nor Totrona (in one place he says he could see the upper part of the latter's body), and did not see the winch turning, nor Totrona paying off the rope. "The other man," said the witness, "see that, the man who was there." In reply to a question by the court, he said that the only way he knew Totrona was there (and in trouble) was because he heard him call out, "Stop the winch!" Palese, another member of the gang, said on the direct that he saw "when the winch began to turn around," but it appears from the rest of his testimony that he also was on the bridge deck, and knew the boom was moving when the winchman left the winch, because he was looking at the rope. The movement of the rope would be the same whether the winch were turning or the rope rendering. His testimony, like that of the other Italians, is very confused, and full of inconsistencies. In response to a leading question on the direct he says he heard Totrona say, "Stop our winch!" In response to a cross question he said he does not know Totrona told the winchman to stop the winch. At one time he says that where he was standing he could not see, and shortly afterwards that he could.

Upon the whole testimony we are not satisfied that there was any reverse movement of the drum of the winch, but are of the opinion that the accident happened because, in the process of surging off, the rope got beyond Totrona's control. Libelant, therefore, has failed to show any negligence of the winchman, or any defect in the winch contributing to cause the catastrophe,—a fault, be it noted, which is not charged in the libel.

The only remaining charge of negligence to be considered is that of "failing to securely and safely place and fasten said boom to said mast." The method of fastening was as follows: Two wrought-iron bands were fastened around the foremast, about 18 inches to 2 feet apart. These have round holes in them, to receive the gooseneck, about 2 inches in diameter and 2 feet long. At the top of the gooseneck is a double eye, which receives a single eye that is bolted on the heel of the derrick boom. A pin passed through double and single eye keeps them in place. There was no pin or collar in the lower end of the gooseneck, and libelant's witnesses testified that within their experience it was usual to have one. The witness Townsend, called by the claimant, explains that on the older type of steamers of 15 or 20 years ago, where the gooseneck was shaped as its name implies, and was comparatively short, it was customary to have a pin or a collar; but that on modern steamers, where the gooseneck is long and straight, no such pin or collar is ordinarily used. It is very plain from the evidence that the boom could not possibly have been lifted by the heel, except by some very extraordinary cause, against which the shipowners were not reasonably bound to provide. The witness Fitzpatrick testified, in response to a question by the court, that the weight of the boom would not hold it in place as ordinarily used; that, if it did not have this pin in the end, the boom would pull it out at any time. "The weight that is coming

out of the ship's hold," says the witness, "is on the end of the boom, not at the gooseneck. That chain has got all the weight on it. That would pull it out unless it had something to keep it in the gooseneck, and prevent it." The model introduced by libelant, and conceded to be correct, shows that the chain which supports the boom at a proper angle with the mast extends from the mast to an iron fillet which surrounds the boom very near its outer end, and that it is into an eye on the very same fillet that the block is hooked through which the fall for handling cargo is rove. Nothing could more clearly show the utter recklessness of this man's testimony. No negligence on the part of the vessel is shown. The decree of the district court is reversed, with costs, and instructions to dismiss the libel.