GRACE LINE, Inc., as owner of THE
SANTA ROSA, Libelant,

v.

THE C. HAYWARD MESECK,
Respondent,

Meseck Towing Lines, Claimant.

United States District Court
S. D. New York.

Feb. 28, 1957.

Kirkin, Campbell & Keating, New York City, R. T. Greene, New York City, of counsel, for libelant.

Purdy, Lamb & Catoggio, New York City, Vincent A. Catoggio, New York City, of counsel, for claimant and respondent.

HERLANDS, District Judge.

This opinion states the findings and conclusions upon which the judgment is based. In dictating this opinion from the bench while the evidence and issues are fresh in mind, the Court is following the suggestion made by Circuit Judge Lumbard in Hecht, Levis & Kahn, Inc. v. S. S. President Buchanan, 2 Cir., 1956, 236 F.2d 627, 629.

In this admiralty cause, the libelant, Grace Line, Inc., as owner of the S. S. Santa Rosa, has brought an action against the Tug C. Hayward Meseck and its chartered owner, Meseck Towing Lines, Inc. Grace Line, Inc., is a Delaware corporation with a place of business in New York, and was at all material times the owner of the steamer Santa Rosa.

The action is based upon an accident which occurred on the afternoon of August 25, 1954, in the North River, New York. At that time, the Santa Rosa was engaged in maneuvers in order to dock at the north side of Pier 58. In this docking operation, the Santa Rosa was assisted by three tugs, Thomas Meseck, Eugene Meseck and C. Hayward Meseck. The libelant claims that, due to the negligence of the Tug C. Hayward Meseck, the port propeller of the Santa Rosa was damaged.

The Santa Rosa had been at sea and its engines had been running continuously for several days. It arrived in New York Harbor on August 25, 1954, and was inbound for the purpose of docking on the north side of Pier 58. The North River runs north and south, while Pier 58 runs east and west. In its moored position, the bow of the vessel would be pointing eastward, toward Manhattan, and the starboard side of the vessel would be alongside of the north side of Pier 58.

At all material times, the docking of the Santa Rosa was being carried on under the direction of a pilot furnished by Meseck, pursuant to a contract containing the New York Harbor Pilotage clause, whereby the pilot became an employee of Grace Line, Inc., while engaged in the performance of pilotage work.

The pilot, Captain Alfred Rowohlt, has been employed by Meseck and its successor, Moran Towing, for about eleven years. He has served under unlimited master and pilot licenses for thirty-four years.

As a docking master, he docks and undocks 500 to 700 vessels annually in New York Harbor. He is an experienced and competent master pilot.

He has had specific familiarity with both the Santa Rosa and her twin sister ship, the Santa Paula, by virtue of his having docked and undocked both vessels "on many occasions" prior to August 25, 1954, using the very same Meseck tugs as were used on August 25, 1954 (trial record pp. 94, 107). Captain Rowohlt made a persuasive and credible witness.

The testimony of Captain Adler and Third Mate Lee, both of the Santa Rosa, likewise established that the Tug C. Hayward Meseck had, on a number of prior occasions, served as the aft assisting tug to the Santa Rosa (trial record pp. 15, 60). Captain Adler and Mate Lee impressed the Court with their reliability and credibility as witnesses.

On the day in question, Captain Rowohlt took over the conn of the Santa Rosa at 4:30 p. m. In doing so, he relieved the Sandy Hook pilot. As was usual, when he came on the bridge, he conferred with the Santa Rosa's captain and made routine inquiries of the Sandy Hook pilot with regard to such matters as the engine room controls and tide conditions.

Captain Rowohlt had assigned the three Meseck tugs to their respective positions before he boarded the Santa Rosa. The C. Hayward Meseck was assigned to the port stern quarter. The other two tugs were assigned to the port bow. The prearranged assignments of tugs represented a standard type of operation.

Aside from the occurrence of the accident, all of the docking arrangements and maneuvers on August 25, 1954, were handled in the normal and routine manner. The overwhelming weight of the credible evidence establishes that there was nothing unusual or abnormal about any phase of the tugs' or ship's activities, operations and maneuvers, except for the negligence of the Tug C. Hayward Meseck. The Santa Rosa was handled in accordance with the normal practice and procedure (trial record pp. 104, 107).

The C. Hayward Meseck has over 2,-000 horsepower and it is considered one of the most powerful tugs in New York Harbor. The three tugs were in the assigned positions at the beginning of the docking operation, which started at about 1629 (4:29 p. m.).

When Captain Rowohlt took over, the vessel was about 600 feet off the New York shore and in the neighborhood of Pier 45. At that time the vessel was going slowly. There was no necessity for giving the tugs any additional orders, for it was to be assumed that they would follow the usual procedure. Captain Adler, the captain of the vessel, was also at the bridge. The quartermaster was at the wheel. The weather was partly cloudy and hazy. According to the weather report for that day dealing with conditions at 17 Battery Place (Exhibit B), rain began at 1631 (4:31 p. m.) and ended at 1655 (4:55 p. m.). Pier 58 is located around 17th Street, which is a few miles from Battery Place. According to Captain Rowohlt, the weather actually encountered by the vessel during the same period consisted of two rain squalls lasting five or ten minutes. The evidence establishes that this rain had no effect whatsoever upon the operations with which we are concerned. There were no unusual tide or wind conditions.

After the docking operation started at about 1629, the steamer's engines were used as follows:

| Port Engine | Time | Stbd. Engine |
| --- | --- | --- |
| Stop | 1629½ | Stop |
| Slow Ahead | 1631½ | Slow Ahead |
| Stop | 1634 | Stop |
| Full Astern | 1635 | Full Astern |
| Slow Ahead | 1636½ | Slow Ahead |
| Stop | 1637 | Stop |
| Half Astern | 1648 | Half Astern |
| Stop | 1649 | Stop |
| Half Astern | 1651 | Half Astern |
| Stop | 1651½ | Stop |
| F. W. E. | 1655 | F. W. E. |

The tugs Thomas Meseck and Eugene Meseck had been made fast on the port bow of the vessel. The C. Hayward Meseck had been made fast at the aft port side. The pilot proceeded with the docking maneuver, in the course of which various orders were given to the three assisting tugboats. Various helm and engine room orders were executed on the Santa Rosa. These orders were the usual routine orders.

Such orders would consist of push or pull signals given to the attending tugs (trial record pp. 13, 104). A mouth whistle is used for the tugs which are forward and the ship's whistle for the tug which is aft (trial record p. 104). The convincing and uncontradicted testimony is that, during docking maneuvers, changes in engine speed of the vessel are not indicated by signals to the tugs (trial record pp. 13, 60–61, 88–89, 108); and it is up to the assisting tugs to anticipate or be prepared for the movements of the vessel or suction created by its propeller movements (trial record pp. 86, 128–129).

The Santa Rosa had twin propellers designated as the port propeller and the starboard propeller. Ordinarily there is a sign above the waterline on the stern of the vessel pointing to the location of the propellers. On the day in question,

the sign indicating the location of the port propeller was not on the vessel, it having fallen off the vessel, somehow or other, prior to the commencement of the docking operations. The captain of the C. Hayward Meseck knew that the Santa Rosa had twin propellers and he knew the location of the propellers. The absence of the sign in no way contributed to the accident.

When the engines of the vessel operate under the order "Full Astern Both Engines," the propellers turn outward (trial record pp. 25-26), and in so doing reverse the direction of the ship. This creates a suction at the stern of the ship immediately above, in the vicinity of and toward the propellers (trial record p. 75). That, however, is well known to seamen, especially masters and pilots of vessels and tugboats.

The measurements of the Santa Rosa are such that, when the uppermost portion of the propeller blades point skyward, there is about 4 feet of water over the top of the blades and approximately 19 feet and 6 inches from the uppermost point of the propellers' blades to the bottom of the keel. The Santa Rosa is 580 feet long, 72 feet wide, and had a draft of about 23 feet, 8 inches, on August 25, 1954 (trial record p. 17).

At 1635 (4:35 p. m.), the pilot gave the order "Full Astern Both Engines"; almost simultaneously, the pilot ordered "Hard Right Rudder." Just prior to these orders the engines had been stopped in accordance with the order given at 1634. At the time of these orders, while the ship was in a north and south direction, and as a result of the combination of the two orders given at 1635, "Full Astern Both Engines", and "Hard Right Rudder," the bow of the ship moved thirty degrees to the right, and the stern of the ship swung to the left (trial record p. 39).

A period estimated at thirty seconds elapsed during the execution of the foregoing orders given at 1635. After thirty seconds, a bump was felt. Captain Rowohlt describes it as if "something struck the wheel" (trial record p.

105). He thought that the tug had bumped the ship or the wheel (trial record p. 105). Captain Adler (trial record p. 9) describes the incident as follows: "We were approaching the docks, and in taking the way of the ship we were going full astern on both engines when we suddenly felt a very strong vibration on the bridge, in fact, the whole ship was shaking, * * *. We knew it came from the propellers."

Edson Lee, the third officer, who had been assigned to supervise the docking operation on the stern end of the vessel, saw the C. Hayward Meseck at 1630 aft of the port propeller (trial record p. 54). The tug had been made fast to the vessel. The position of the tug relative to the vessel is indicated in Lee's diagram (Exhibit 11) by the notation "1630." Lee states that between 1630 and 1635 the relative positions of the vessel and the C. Hayward Meseck changed and, at the time of the accident, the tug was in the position indicated by the notation "1635" on Exhibit 11—right over the propeller and with a long scope of line out (trial record p. 77).

The Court accepts the testimony of Lee in preference to that of Candido Coelho, who was employed as a deckhand on the tug at the time of the accident. The Court regards Exhibit 11, Lee's diagram, as accurate.

According to Lee (trial record pp. 54-55, 70), he felt and heard a heavy vibration and a slapping sound for a few seconds; then these sounds stopped, and while he was walking athwartship from starboard to port, these same sounds started again. Lee did not see any actual contact between the vessel and the tug. However, he states that when the tug hit the propeller, it was "pushing" the Santa Rosa (trial record p. 57-a).

The pilot of the tugboat, George O. Dyrsten, and Lee had an on-the-spot conversation in which Captain Dyrsten said that "he thought he hit the propeller" (trial record pp. 55, 83). Captain Dyrsten did not recall this conversation. He made an unimpressive witness and exhibited poor recollection of the events of

the day. Captain Dyrsten, called as a witness by the respondent, testified on direct examination that, on such occasions when he pilots a vessel during docking maneuvers, he may use "Slow Astern" or "Half Astern" or "Full Astern," if necessary, and that these engine room orders are all a matter of judgment.

According to Captain Rowohlt, the giving of the order at 1635 "Full Astern Both Engines" was normal operating procedure.

In response to respondent's question whether the combination orders given at 1635 caused the accident, Captain Rowohlt stated that he did not know such to be the fact. The proof does not establish that the giving of such orders was either negligence or caused the accident.

■ Accordingly, the Court finds that during the operation and approximately between 1635 and 1636, while the steamer's engines were working full astern, the Tug C. Hayward Meseck came in contact with the port propeller of the Santa Rosa; that this docking operation was in all respects a normal one, as had been carried out on many times in the past by all personnel and the vessels involved; that neither by custom nor regulation was there any duty on the part of the steamer or its personnel to give notice by signaling or otherwise to the attending tugs as to using the steamer's engines; that it is the duty of the tugs attending steamers during the docking operation at all times to stand clear of the steamer's propellers. The Court finds that the Tug C. Hayward Meseck struck the Santa Rosa in the way of her propeller; that the contact between the tug and the vessel was due to no fault and negligence of any of the personnel of the Santa Rosa, including the Meseck tug captain who was acting as docking master, but rather was due solely to the negligent handling of the C. Hayward Meseck.

■ The liability of an assisting tug to the vessel being assisted depends upon whether the tug has been guilty of negligence. The tug is not an insurer. Her obligation is to exercise reasonable skill and care. Griffin on Collision, 1949, pp. 416–417. The mere happening of an accident to the vessel does not establish the tug's negligence, which must be proved affirmatively. Griffin, supra, pp. 417, 460.

It is inherent in this type of operation that tugboats working near the stern of a large vessel take the necessary precautions to stay well clear of the vessel's propellers, inasmuch as during the docking or in the docking maneuver these propellers are used intermittently at various speeds, both ahead and astern. The orders to use the vessel's engines emanate from her bridge and go direct from the bridge to the engine room, without any prior notice or warning to the attending tugs. This is predicated upon the justifiable assumption that the various uses of the ship's engines should be anticipated by the tugs in this sort of maneuver. The necessity of the attending tug working the stern section of the vessel to stand clear of the propellers in no way affects the efficiency of the tug to fully perform her assigned duties.

■■ The respective duties and obligations of a steamer docking under her own power and a tug engaged to assist in the operation have long been settled. A tug engaged to assist a docking steamship is bound to know that the propeller of the vessel may be used frequently and without specific warning. The tug must, accordingly, do that which is necessary to avoid coming in contact with the propeller. The tug is engaged to perform a task which she holds herself out as being capable of performing. When, through failure to take action to prevent coming into contact with a steamship's propeller, the tug strikes and damages it, the tug is liable. Such is the case at bar.

Cases involving strikingly similar facts have come before the courts. See The City of New York, 2 Cir., 1893, 54 F. 181; The Olympic, 2 Cir., 1915, 224 F. 436; Tuscania-W. H. McAllister (E. D.N.Y.1940) 1940 A.M.C. 32; The Ed-

ward T. Dalzell (S.D.N.Y.1937) 1938 A. M.C. 273; Charles Kurz & Co., Inc. v. United States (S.D.N.Y.1946) 1946 A. M.C. 1303; Dorothy Luckenbach-Hustler (E.D.Pa.1938) 1938 A.M.C. 704; Freehold-Saxonia (S.D.N.Y.) 1928 A.M.C. 1601.

Usage cannot be allowed to subvert the settled rules of law. Barnard v. Kellogg, 1870, 10 Wall. 383, 77 U.S. 383, 391, 19 L.Ed. 987. That a rule is customarily violated does not justify its violation. See Charente S. S. Co. v. United States, 5 Cir., 1926, 12 F.2d 412. The foregoing axiomatic principles, cited by respondent, do not apply to the facts of this case.

The question here presented is whether 33 U.S.C.A. § 213 required the Santa Rosa, which was being actively assisted into her berth by the Tug C. Hayward Meseck, to give that tug the signal of full speed of engines astern when the Santa Rosa reversed its engines as a normal and expected incident of the docking maneuver. The tug had been made fast to the vessel. The tug and the vessel were cooperating parts of a project in which the tug and the vessel were working as a team or unit.

33 U.S.C.A. § 213 provides:

"When vessels are in sight of one another a steam vessel under way whose engines are going at full speed astern shall indicate that fact by three short blasts on the whistle."

For purposes of this section and under the circumstances of this case, the vessel and the tug are to be considered as if they were one. Accordingly, the requirement in Section 213 does not apply to the situation at bar. See Tuscania-W. H. McAllister (E.D.N.Y.1940) 1940 A.M.C. 32, at page 35. Cf. Griffin on Collision (1949) Sec. 229.

It is respondent's contention that, in reversing her engines and putting her rudder hard right, the Santa Rosa created suction which drew the C. Hayward Meseck toward the Santa Rosa's propellers and that the ship's stern swung into the C. Hayward Meseck; that the Santa Rosa's propeller struck the tug; that the tug had been given no warning, information or signal of that maneuver by the Santa Rosa, and that the Santa Rosa created an unexpected hazard from which the C. Hayward Meseck could not extricate itself.

The Court concludes that the accident was not caused by any negligence of the Santa Rosa; that the maneuvering of the Santa Rosa did not create any reasonably unanticipated or unexpected hazard; that those navigating the Santa Rosa were not negligent in not ordering the C. Hayward Meseck away from the stern or in not warning the C. Hayward Meseck of the maneuver which the ship was about to make; that the C. Hayward Meseck was negligently permitted to come in contact with the port propeller of the Santa Rosa during the course of docking said steamer, and that Meseck Towing Lines, Inc., as claimant of the Tug S. Hayward Meseck, are solely responsible for the damages resulting from this negligence.

The libelant shall have a decree against the C. Hayward Meseck, as prayed for, together with interest, costs and disbursements.

The issue of libelant's damages will be referred to Emil Weitzner, Esq., of 70 Pine Street, as Commissioner, to ascertain and compute the damages and to report thereon.

Submit interlocutory decree within five days from the date hereof.