624 F.2d 643
 COMMERCIAL UNION INSURANCE COMPANY, Plaintiff-Appellee Cross-Appellant,
v.
M/V BILL ANDREWS, its engines, tackle, apparel, etc., in rem
and Canal Barge Company, Inc.,
Defendants-Appellants Cross-Appellees.
 No. 78-2966.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 21, 1980.
 
 Donald L. King, Christopher A. Helms, New Orleans, La., for defendants-appellants cross-appellees.
 Monroe & Lemann, Nigel E. Rafferty, New Orleans, La., for plaintiff-appellee cross-appellant.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before MORGAN, CHARLES CLARK and TATE, Circuit Judges.
 LEWIS R. MORGAN, Circuit Judge.
 
 
 1
 The diesel tug M/V COLONEL NEAL sank into the Mississippi River on July 23, 1976 after it was buffeted by wheel wash from the M/V BILL ANDREWS during a refueling operation in which the two vessels were engaged. Commercial Union Insurance Company, insurer of the COLONEL NEAL's owner, paid $32,000 on the loss, and as subrogee filed this suit against the BILL ANDREWS and its owner, Canal Barge, Co., Inc. The district court found the BILL ANDREWS seventy-five percent at fault and the COLONEL NEAL twenty-five percent at fault, and awarded Commercial Union damages reduced proportionately to $24,000. Both parties appealed, disclaiming any fault in causing the accident. Canal Barge also contends on appeal that the district court's valuation of the COLONEL NEAL at $32,000 was erroneous, and that the district court abused its discretion in disallowing the testimony of one of their witnesses.
 
 
 2
 I. BACKGROUND.
 
 
 3
 Port Marine Service, Inc. purchased the COLONEL NEAL in 1965 at a cost of $32,000 for use as a pusher for a fuel flat in the fueling of large tow boats in the Mississippi River. The tug was affixed to the fuel flat by three sets of steel wire cables. As diesel fuel was discharged from the flat, the wire cables were adjusted to prevent the flat's changing draft from lifting the bow of the COLONEL NEAL.
 
 
 4
 Typically, fuel flats and their tugs are sent downriver to meet vessels headed upriver. The fueling operation is then carried out as both vessels move slowly upriver, saving the serviced vessel the delay of a full stop. Underway fueling occurs primarily in the servicing of vessels headed upriver, because the slower speed of the vessels makes the operation safer.
 
 
 5
 The BILL ANDREWS, a large diesel pushboat, was headed upriver on July 23 with a crew of ten captained by Billie Smith and a flotilla of eight barges arranged in two lines of four. It met the COLONEL NEAL early in the morning of July 23, 1976 just south of Baton Rouge and continued upriver as the COLONEL NEAL began to load the barges with diesel fuel. The COLONEL NEAL was manned by fueling operator Jessie Callahan and deckhand Henry Simpson.
 
 
 6
 Under instructions from the BILL ANDREWS, the COLONEL NEAL moved its fuel flat into fueling position alongside the flotilla's starboard lead barge and was affixed there by soft rigging tying the vessels together. Callahan and his deckhand then left the deck of the COLONEL NEAL and went to the fuel flat to operate the valves. When the tanks of the first barge were filled, the COLONEL NEAL and its fuel flat dropped back to fuel the barge astern, and then to each following barge until all of the starboard barges were loaded with fuel. Twice during the loading of the starboard barges Callahan asked the pilot of the BILL ANDREWS to slow down, as the speed of the flotilla was causing the fuel flat to dive.
 
 
 7
 After the fueling of the starboard barges, the COLONEL NEAL dropped behind and around the BILL ANDREWS to begin fueling the port tier of barges. By 6:00 A.M. the fueling of the port tier of barges was completed, and Captain Smith instructed the COLONEL NEAL to bring the fuel flat around to the BILL ANDREWS' starboard side to fill the tanks of the BILL ANDREWS. Callahan moored the fuel flat just behind the face wires leading from the BILL ANDREWS to the starboard barge, leaving the stern of the fuel flat slightly astern of the BILL ANDREWS.
 
 
 8
 The fuel flat was connected to the BILL ANDREWS by three sets of lines running from the middle, bow and stern of the flat. The COLONEL NEAL remained affixed to the stern of the fuel flat. To allow for the increased freeboard of the fuel flat, Callahan loosened the bow face wires of the COLONEL NEAL and then joined his deckhand on the fuel flat to make hose connections with the BILL ANDREWS. Though unmanned, the COLONEL NEAL was clearly visible from the deck of the fuel flat and from the pilothouse of the BILL ANDREWS at all times during this stage of the fueling operation.
 
 
 9
 As Callahan and his deckhand continued with the fueling operations from the fuel flat, the flotilla reached a starboard bend in the river around Profit Island. Proceeding at a speed of between 4 and 6 m. p. h., Captain Smith turned the rudder of the BILL ANDREWS 1/2 to 3/4 to make the bend. This maneuver directed the wheel wash of the BILL ANDREWS more sharply against the port side of the COLONEL NEAL, and caused the wheel wash to splash over the gunwhale. The COLONEL NEAL listed to port, straining the port face wire running to the port stern corner of the fuel flat. When Callahan observed the effect of the wheel wash on the COLONEL NEAL, he tried to hail the master of the BILL ANDREWS, but was unable to shout over the noise of the engines. Within minutes the port wire snapped and the COLONEL NEAL listed to starboard, straining the remaining wires connecting the COLONEL NEAL with the fuel flat. Soon thereafter, Captain Smith noticed that the COLONEL NEAL was in distress, and though he could not stop the flotilla immediately, he began to allow the headway to run out. Nevertheless, the COLONEL NEAL continued to take on water until the last wires broke and the tug sank.
 
 
 10
 II. ALLOCATION OF FAULT.
 
 
 11
 The district court held the BILL ANDREWS to be seventy-five percent at fault in causing the sinking of the COLONEL NEAL, in accordance with the responsibility of the master of a pushing vessel for the safe navigation of its flotilla, including fueling vessels temporarily appended to the tow. Chitty v. M/V Valley Voyager, 408 F.2d 1354 (5th Cir. 1969). Twenty-five percent fault was allocated to the COLONEL NEAL for failure to move to a more secure position when the flotilla approached the bend.
 
 
 12
 The BILL ANDREWS and Canal Barge Co. protest that the navigation of the BILL ANDREWS was in every respect routine, and that no act of negligence by the crew of the BILL ANDREWS was ever established in the trial below. Commercial Union, on the other hand, asserts that the BILL ANDREWS was solely at fault since it alone controlled the speed and direction of the flotilla.
 
 
 13
 Regarding the negligence of the BILL ANDREWS, the district court found that Captain Billy Smith used excessive power in attempting to speed the 1000 ft. flotilla around the bend, and that in view of the position of the COLONEL NEAL in the flotilla, Smith should have navigated the bend on a slow bell. The district court further found that the strength of the wave wash resulting from the powered turn of the massive flotilla caused the wires connecting the COLONEL NEAL with the flat to break, and led ultimately to the sinking of the COLONEL NEAL. Regarding the negligence of the COLONEL NEAL, the court found that Callahan should have foreseen the danger posed by the approaching bend and could have relocated the tug.
 
 
 14
 The findings of fact of a trial court are binding on appeal unless clearly erroneous. Tittle v. Aldacosta, 544 F.2d 752 (5th Cir. 1977). Although the evidence on many pivotal issues of this case was conflicting, we cannot say that the court's conclusions are unsupported by the record. Given these findings of fact, the responsibilities of the parties are dictated by Chitty v. M/V Valley Voyager, supra.
 
 
 15
 Like the instant case, Chitty involved a suit for the loss of a refueling tug sunk during the refueling of a larger pusher tug and flotilla of barges. The facts summarized by the court in Chitty are strikingly similar to the facts in the record before us. The refueling tug was moored to the side of the pusher tug as the flotilla approached a bend in the river. When the flotilla pivoted to take the turn, the refueling tug was forced sideways through the water. The refueling tug listed and began to scoop up water until it sank. The court, rejecting many of the same arguments presented by the attorneys in this case, affirmed the trial court's finding that the vessels were equally at fault. Both vessels, the court observed, were obligated to maintain a proper look-out and were free to take certain precautions, or at least to communicate, in the face of danger.
 
 
 16
 Canal Barge makes no effort to distinguish this case from Chitty. Instead, it cites as analogous those cases which hold that a tugboat employed to assist a larger vessel dock or undock assumes the risk of foreseeable wheel wash. See, e. g., The Olympic, 224 F. 436 (2d Cir. 1915); The City of New York, 54 F. 181 (2d Cir. 1893). Even these cases require that both vessels use due care to avoid creating extraordinary risks. The COLONEL NEAL, however, was not a tug sent to guide the BILL ANDREWS but a refueling tug that became an appendage of the BILL ANDREWS's tow during refueling. Clearly, Chitty provides the applicable rules of responsibility.
 
 
 17
 Canal Barge also contends that Commercial Union, as subrogee of the COLONEL NEAL's owner, should be allowed no recovery from Canal Barge because the COLONEL NEAL breached its warranty of workmanlike performance. Canal Barge cites Weyerhaeuser Steamship Co. v. Narcirema Operating Co., Inc., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958), for the principle that a shipowner's right of indemnity against a negligent contractor for breach of warranty is not necessarily defeated by the shipowner's concurrent negligence. If Canal Barge has a right to indemnity from the COLONEL NEAL, Canal Barge reasons, any loss resulting from the refueling operation must be shifted back to the COLONEL NEAL and its subrogee.
 
 
 18
 A shipowner's right to indemnity from a negligent contractor arises from the contract by implication. Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc., supra. Thus, whether the shipowner can maintain that right despite its own negligence depends in part on the nature of the agreement and its assignment of responsibility. In this case the COLONEL NEAL undertook to refuel the BILL ANDREWS in workmanlike fashion, but during the refueling operation the responsibility for the navigation of the entire flotilla was left to the BILL ANDREWS. While the COLONEL NEAL might have disengaged itself from the BILL ANDREWS, it could not direct the course or speed of the BILL ANDREWS. It was the duty of the BILL ANDREWS to adapt to any special conditions of which it was aware, including those conditions that were the result of the negligence of the COLONEL NEAL. Tebbs v. Baker-Whiteley Towing Co., 407 F.2d 1055 (4th Cir. 1969).
 
 
 19
 Canal Barge's attempt to use its right of indemnity as a shield must fail for another reason. As this court held in Matter of Breton Island Co., Inc., 567 F.2d 624 (5th Cir. 1978), if a shipowner's negligence prevents or substantially hinders the contractor's performance, the shipowner cannot shift all losses to the contractor by reason of an implied right of indemnity. Considering the nature of the BILL ANDREWS' negligence together with the district court's finding that the BILL ANDREWS was seventy-five percent at fault, we find that the implied right of indemnity cannot be invoked to shift all of the loss back to Commercial Union.
 
 
 20
 Commercial Union also challenges the findings of the district court, disclaiming any fault on the part of the COLONEL NEAL. To distinguish this case from Chitty, Commercial Union argues that in Chitty the primary fault of the refueling tug's captain was in failing to warn the pushboat that the refueling tug was listing, whereas the captain of the COLONEL NEAL tried but was unable to warn the BILL ANDREWS that the COLONEL NEAL was listing. At best, this variation in the facts only serves to explain why the district court thought the COLONEL NEAL to be relatively less culpable than the refueling tug in Chitty. Smith's effort to warn the BILL ANDREWS may have been zealous, but it was also belated. The district court found that the COLONEL NEAL had ample opportunity to prepare for the approaching bend, either by requesting the BILL ANDREWS to cut its speed, or by moving to a safer position.
 
 
 21
 Commercial Union would have us apply the doctrine of last clear chance to shift full responsibility to the BILL ANDREWS, reasoning that the negligence of the COLONEL NEAL only created a condition upon which the BILL ANDREWS' negligent navigation acted. The doctrine of last clear chance was once selectively applied in admiralty cases for the purpose of avoiding the sometimes harsh consequences of the now defunct rule of equal division of damages where one party was only slightly negligent. See Petition of Kinsman Transit Company, 338 F.2d 708 (2d Cir. 1964). Since United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) inaugurated the rule apportioning damages in proportion to fault, the doctrine of last clear chance is now of doubtful force in this field of the law. In any case, we do not believe the facts of this case present a last clear chance situation, since the negligence of both vessels was essentially the same failure to anticipate the consequences of a speedy turn. If the BILL ANDREWS had an extra moment in which to avert the disaster, this difference in fault is better visited by the district court's apportionment of damages than by shifting all of the loss to the BILL ANDREWS.
 
 
 22
 III. THE DISTRICT COURT'S RULING PREVENTING THE TESTIMONY OF CANAL BARGE'S UNDEPOSED WITNESS
 
 
 23
 On January 9, 1978, counsel for Commercial Union filed interrogatories requesting the names and current addresses of all persons who were aboard the M/V BILL ANDREWS on the date of the casualty and who would be called as witnesses by Canal Barge. Two and a half months later, Canal Barge filed answers listing among the requested names Leonard McDonald.
 
 
 24
 In a pre-trial order dated April 7, 1978, Commercial Union reserved the right to depose prior to trial any of the crew of the BILL ANDREWS who would be called as witnesses. Since many of the crew were then working on vessels on the Mississippi River, the parties attempted to arrange for conveniently scheduled depositions that would not disrupt the crew members' employment. When this effort failed, Canal Barge and Commercial Union agreed that depositions would not be needed as the crew members would not be called as witnesses. The court was informed of this arrangement at a conference on July 24.
 
 
 25
 During the trial on August 3, Canal Barge called Leonard McDonald as a witness. Commercial Union's objection to McDonald's testimony was sustained, and Canal Barge now contends that the district court abused its discretion in preventing McDonald's testimony. We agree with Commercial Union that the pretrial order of April 7, preserving Commercial Union's right to depose, would be violated if Canal Barge were allowed to examine McDonald after promising that a deposition would not be necessary. Rule 16 provides that a pre-trial order "when entered controls the subsequent course of the action. . . ." Among the sanctions available to the district court when a party fails to give notice of its intention to present a witness is the exclusion of the witness from the trial. Admiral Theatre Corp. v. Douglas Theatre Co., 585 F.2d 877 (8th Cir. 1978); Grain Dealers Mutual Insurance Company v. Farmers Union Cooperative Elevator and Shipping Assoc., 377 F.2d 672 (10th Cir. 1968). Under the circumstances of this case, the district court properly exercised its discretion to decline to hear McDonald's testimony.
 
 IV. THE VALUE OF THE COLONEL NEAL
 
 26
 The district court awarded Commercial Union $24,000 damages for the loss of the COLONEL NEAL, after apportioning the loss according to each party's share of fault. Implicitly, the court valued the tug at $32,000. Canal Barge questions first whether the court in fact made a finding of value based on market value, and second whether the record supports such a finding.
 
 
 27
 In its findings of fact the court stated that "The COLONEL NEAL was insured by the plaintiff who, pursuant to the terms of coverage, paid its assured $32,000, the full value of the COLONEL NEAL. . . . (emphasis added). Canal Barge interprets this language to mean that the court used insured value as the measure of damages, but as we read the court's findings, the reference to Commercial Union's obligation under the policy only clarifies the basis of Commercial Union's status as a subrogee and the maximum extent of Commercial Union's rights against Canal Barge. The italicized language shows that the court found the value of the COLONEL NEAL to be at least commensurate with the amount paid by Commercial Union to its insured.
 
 
 28
 While the evidence of value of the COLONEL NEAL is scanty, we cannot say that the court's finding is unsupported. The vessel was purchased in 1965 at a cost of $32,000. In September 1972, three years and ten months before the casualty, the vessel was appraised by the insurer at $32,000. Commercial Union continued to insure the COLONEL NEAL at $32,000 until the total loss of the vessel. While certainly not definitive of fair market value, insured value is at least some evidence of fair market value. Carl Sawyer, Inc. v. Poor, 180 F.2d 962 (5th Cir. 1973). The only evidence of lesser value is the testimony of Calvin Simpson, vice-president of Port Marine Services, that the vessel was fully depreciated for tax purposes to $6,300. There was no evidence of any deterioration in the condition of the COLONEL NEAL since its appraisal. A fuller investigation of the value of the ship by the parties would have made the district court's task much easier, but the court was required to make a finding of value even on this inadequate record, and we find that its conclusion was not clearly erroneous.
 
 The judgment of the district court is
 
 29
 AFFIRMED.